CITY OF PHILADELPHIA, Petitioner,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 6, 1997.

Decided Nov. 14, 1997.

**1140** 

Amy E. Wilkinson, Chief Deputy City Sol., and Marie C. Lasota, Deputy City Sol., Philadelphia, for petitioner.

Terrence J. Buda, Asst. Counsel, Harrisburg, for respondent.

Douglas G. Bonner, Washington, DC, for intervenor, PECO Hyperion Telecommunications.

Before PELLEGRINI and KELLEY, JJ., and MIRARCHI, Jr., Senior Judge.

PELLEGRINI, Judge.

The City of Philadelphia (City) appeals an order of the Pennsylvania Public Utility Commission (PUC) granting a request for a declaratory order by Bell Atlantic–Pennsylvania, Inc. (Bell Atlantic) and directing Bell Atlantic to provide its Master Street Address Guide used in Enhanced 911 (E–911) service to PECO Hyperion Telecommunications (PECO) without its consent.

This case involves the interplay between the Pennsylvania Public Safety Emergency Telephone Act[1] (commonly referred to as Act 78) providing guidelines for implementing and maintaining 911 emergency service, Chapter 30 of the Public Utility Code[2] designating the PUC's authority to regulate telecommunications services, and the federal Telecommunications Act of 1996[3] (Telecom Act) providing regulations to promote competition in the telephone industry since deregulation. Also involved are the responsibilities

---

1. Act of July 9, 1990, P.L. 340, 35 P.S. §§ 7011–7021.

2. 66 Pa.C.S. §§ 3001–3009.

3. 47 U.S.C. §§ 160–614.

of the PUC and the City under those Acts relative to 911 and E–911 services.

Act 78 was created to provide a statewide emergency telephone 911 system to allow citizens in the Commonwealth to have rapid and direct access to emergency aid. Under this system, a person dialing 911 by telephone is connected to a public safety answering point [4] to request that police, fire, medical or other emergency personnel respond to a situation requiring immediate attention. To ensure that the 911 system was properly developed, implemented and maintained, counties were given the following powers and duties:

(1) To designate a member of county government as a coordinator who shall serve as a point of contact with the department (of community affairs) and shall develop a county plan for the implementation, operation and maintenance of a 911 system. Where technologically feasible, the county plan shall be adequate to provide service for the entire county.

(2) To make arrangements with each telephone company providing local exchange telephone service within the county's jurisdiction to provide 911 service.

(3) To send a copy of the proposed county plan to the appropriate telephone company upon submission of the plan to the department.

(4) To cooperate with the department, the council (Pennsylvania Emergency Management Council) and the commission (PUC) in preparation and submission of the county plan and contribution rate.

(5) To execute all contracts, mutual aid agreements, cross-service agreements and all other necessary documents which may be required in the implementation of the county plan.

35 P.S. § 7014(a).

Because the County of Philadelphia is the same entity as the City, and one 911 system serves the entire City/County of Philadelphia, the City has the authority to exercise the same powers and duties as counties under 35 P.S. § 7014(a).

As part of these responsibilities, the City was required to have a Master Street Address Guide (MSAG) to offer to emergency personnel to assist them in responding to 911 calls.[5] The MSAG contains all street names, house/building numbers and address ranges in the 911 serving area. It does not contain names and phone numbers of individuals. The MSAG is part of the database of customer information that is used in the Automatic Location Identification function (ALI) of E–911 service.[6] The City requested Bell Atlantic, a telecommunications carrier that provides 911 emergency phone service to the City, to develop and create an MSAG for the City's E–911 system. The City claimed that it paid Bell Atlantic a one-time nonrecurring charge of several hundred thousands of dollars for the MSAG and continues to pay Bell Atlantic a monthly fee of $33,297 for updates to this guide.[7]

Without the City's knowledge or approval, Bell Atlantic entered into an interconnection agreement with PECO, a competitive local exchange carrier (CLEC) in Philadelphia, as required by the federal Telecommunications Act of 1996 (Telecom Act).[8] The Telecom Act was enacted to deregulate the telecommunications industry and to promote compe-

---

**4.** Act 78 defines a public safety answering point as the first point at which calls from emergency assistance from individuals are answered, operating 24 hours a day.

**5.** Under 35 P.S. § 7019(a), every telephone service supplier is required to provide customer telephone numbers, names and service addresses to 911 systems when required. It also states that even though that information must be available to 911 systems, that information remains the property of the disclosing service supplier.

**6.** The ALI is one of the features of E–911 service that forwards a name and address of the calling party. When that function is provided, the public agency must provide Bell Atlantic with an MSAG for the locality where E–911 service is provided. The MSAG is used to ensure the information entered into Bell Atlantic's databases and used to provide ALI is in the proper format to minimize the risk of misinterpretation of information by emergency service providers or misdirection of E–911 calls.

**7.** Bell Atlantic did not assert ownership over the MSAG.

**8.** 47 U.S.C. §§ 160–614.

tition among telecommunication carriers. That Act requires, *inter alia,* that Bell Atlantic interconnect with other competing telecommunications carriers and provide dialing parity, as well as nondiscriminatory access to 911 and E–911 services. 47 U.S.C. §§ 251(a), (b); 271(c)(2)(B)(vii)(I). The Telecom Act specifically recognizes that Bell Atlantic is permitted to enter into binding interconnection agreements with CLECs for access to its services including 911 and E–911 services.

Under Section 7.4.3 of the interconnection agreement between Bell Atlantic and PECO, Bell Atlantic was to provide PECO with its MSAG within 30 days upon request so that PECO could facilitate access to the E–911 system for its customers. After receiving a request from PECO for the MSAG, Bell Atlantic discussed the request with the City.[9] The City agreed to the release of the MSAG to PECO and any other CLEC when the following conditions were met:

- Completion of a 911 questionnaire;
- Successful completion of 911 testing procedures;
- Execution of a letter of intent to indemnify the City;
- Execution of an agreement to pay for the cost of audit systems and trunking related to 911 connection;
- Execution of an agreement to maintain appropriate levels of insurance;
- Payment of a licensing fee; [10] and
- Agreement not to sell, lease, license, rent, loan, provide or transfer the MSAG in any manner to any other entities.

Although PECO had answered the 911 questionnaire and passed the City's testing procedures, PECO was unwilling to indemnify the City or bear the costs of trunk lines necessary to connect with the 911 system because Bell Atlantic did not have to indemnify the City and Bell was paid $15 per trunk line by the City pursuant to tariff rates. Because the City was only imposing that condition on CLECs and not on Bell Atlantic, PECO argued that the City's requirements were discriminatory and in violation of Section 251 of the Telecom Act. For those reasons as well as PECO's intention to give the MSAG to other entities without its permission, the City prohibited Bell Atlantic from providing PECO with a copy of the MSAG.

Because the terms of the interconnection agreement between PECO and Bell Atlantic did not place any pre-conditions on PECO before being provided with a copy of the MSAG, Bell Atlantic petitioned the PUC for a declaratory order to determine its obligation to provide PECO with the MSAG when the City objected because its conditions were not met.

The City filed a response and new matter to Bell Atlantic's petition claiming that it not been consulted or advised of Bell Atlantic's intent to enter into an agreement with PECO and opposed the release of the MSAG without all of its conditions being met due to safety reasons. It explained that for a long time, Bell Atlantic had been the only telephone service provider. However, since deregulation, more than 30 CLECs were completing interconnection agreement negotiations with Bell Atlantic, and the City would be required to manage connections and use of its 911 system for all of those CLECs. Based on the anticipated increased number of telephone service providers, the City stated that its responsibilities for delivering public safety services would be jeopardized without its conditions first being met before dispensing the MSAG.[11] Without holding a hearing and declining to reach the issue of whether the City owned the MSAG, the PUC issued an order directing Bell At-

9. It appears from the record that Bell Atlantic approached the City to discuss PECO's interconnection agreement as well as other potential agreements, because in the near future more than 30 CLECs were expected to provide service to the City's residents, businesses and institutions and they would have some tie to the City's E–911 system.

10. At oral argument, the City stated that it had no present intent of levying a licensing fee on PECO.

11. For example, the City stated that new CLECs had conducted unauthorized tests, flooding calls into the 911 center at times when the City was not prepared to receive those calls.

lantic to provide PECO with a copy of the MSAG without the conditions imposed by the City being met.

In its decision, the PUC noted that it had jurisdiction to take action to foster deregulated telecommunication competition citing Chapter 30 of the Public Utility Code, and the authority to approve non-discriminatory interconnection agreements under the Telecom Act.[12] Under both Acts, it found that it also had the authority to enforce deregulation by ensuring local exchange carriers like Bell Atlantic provide competitors with reasonable access to its service and facilities, including 911 services. While it noted that the City asserted a proprietary interest in the MSAG, it determined that even if it did own the MSAG, that was not dispositive as to whether Bell Atlantic was required to release the MSAG to PECO. It reasoned that because Bell Atlantic was required under the Telecom Act to provide PECO and other CLEC's with nondiscriminatory access to 911 and E–911 services, even if the City had a property interest in the MSAG and had the responsibility under Act 78 to implement a 911 system, its interest and responsibilities were subordinate to the provision that nondiscriminatory access must be given to 911 and E–911 services. The PUC concluded that because Act 78 mandated statewide 911 service, in order for PECO to provide that service to its customers, Bell Atlantic had to provide PECO with the MSAG.[13] The City then filed an appeal from that decision with this court.[14]

▇▇▇ On appeal, the issue is whether the PUC's authority under the Public Utility Code and the Telecom Act to deregulate telephone service can supersede the City's responsibilities under Act 78 and its public safety concerns to order Bell Atlantic to provide PECO with the MSAG to ensure compe-

tition in the marketplace. If the PUC has such authority, the question then becomes where that authority ends when the City's authority to implement 911 emergency service overlaps.[15]

The General Assembly has given the PUC the power to supervise and regulate all public utilities doing business in the Commonwealth. *See* 66 Pa.C.S. § 501(b). From that general power, the PUC has been given specific authority to enforce deregulation in the telecommunications industry in Pennsylvania. Section 3005(b) of the Public Utility Code, 66 Pa.C.S. § 3005(b), provides:

> The commission shall establish regulations to prevent local exchange telecommunications companies from engaging in unfair competition and require that local exchange telecommunications companies provide reasonable nondiscriminatory access to competitors for all services and facilities necessary to provide competing services to consumers.

Section 3009(b)(2) of the Public Utility Code, 66 Pa.C.S. § 3009(b)(2), further provides:

> Nothing in this chapter shall limit the authority of the commission to ensure that local exchange telecommunications companies do not make or impose unjust preferences, discriminations or classifications for protected telephone service and other noncompetitive services.

Not only has the PUC been given power over deregulation under the Public Utility Code, but 47 U.S.C. § 252(e)(1) requires any interconnection agreement adopted by negotiation or arbitration to be submitted to the PUC for approval or rejection. That section provides:

---

**12.** *See* Section 3009(b)(2) of the Public Utility Code, 66 Pa.C.S. § 3009(b)(2) *infra.*

**13.** Under Act 78, the PUC's responsibilities are solely related to reviewing contribution rates assessed against a telephone subscriber for costs of a 911 system.

**14.** The City also filed an Application for Supersedeas, which was granted pending our decision in this matter.

**15.** Our scope of review is limited to determining whether constitutional rights were violated, an error of law committed, or whether the PUC's findings are supported by substantial evidence. *Duquesne Light Co. v. Pennsylvania Public Utility Commission,* 163 Pa.Cmwlth. 367, 643 A.2d 130 (1994), *petition for allowance of appeal denied,* 539 Pa. 657, 651 A.2d 543 (1994).

Any interconnection agreement adopted by negotiation or arbitration shall be submitted for approval to the State commission. A State commission to which an agreement is submitted shall approve or reject the agreement, with written findings as to any deficiencies.

Under Act 78, the City has jurisdiction to implement a 911 system, including the execution of all contracts that "may be required in the implementation of the 911 plan." The PUC, however, has extremely limited responsibilities, none of which directly relate to the implementation or enforcement of the 911 system. Section 7013(c) of Act 78 provides:

(c) **Powers and duties of the commission.**—The Commission shall have the following powers and duties:

(1) Review the contribution rate requested by the county based on the costs of the plan.

(2) Approve or modify the contribution rate requested by the county and forward its decision to the department.

Under the provisions of both of these acts, the PUC has the primary responsibility for implementing telecommunication deregulation in Pennsylvania, while the City has the primary responsibility for the 911 system. This presents the quandary of resolving what happens when the legitimate interests and jurisdiction of the PUC in fostering deregulation clash with the City's legitimate responsibilities and concerns to protect the public safety by safeguarding the integrity of its 911 plan or vice versa. Each of the parties here would suggest that its interests and jurisdiction are paramount over the other's.

In *Duquesne Light Company v. Borough of Monroeville*, 449 Pa. 573, 298 A.2d 252 (1972), our Supreme Court facing a similar quandary addressed how to reconcile conflicts where a local government and the PUC had overlapping statutory authority. In that case, the Borough had enacted an ordinance giving it the power to create an underground wire district and prohibit the introduction of new wires, cables and poles within the defined district. It also gave the Borough the power to require the removal of existing facilities by relocation. Duquesne Light maintained wire facilities in one of the Bor-

ough's districts and was notified by the Borough to remove those wires and relocate them underground. Duquesne Light and the PUC filed an appeal arguing that the Borough Code was preempted by the Public Utility Code which gave the PUC general regulatory powers and it did not have to remove its wires.

Our Supreme Court determined that the Borough Code was not preempted by the Public Utility Code because the intent by the legislature was to give the Borough unfettered power to compel undergrounding of wires within a reasonable district. However, the Court noted that the PUC had exclusive regulatory jurisdiction over implementing public utility facilities and it was the proper forum for adjudication of rates, services and facilities of public utilities. It then determined that the General Assembly intended the Borough Code to be applied harmoniously with the Public Utility Code because the Borough Code specified that it could only effectuate its purpose by initially proceeding before the PUC. Holding that the Borough Code and the Public Utility Code were to be read together to give effect to both of the apparently conflicting statutes, the Court concluded that the Borough had the power to define reasonable wiring districts but their implementation could only be achieved through PUC action. We believe that a similar resolution as that used in *Duquesne Light* is appropriate here to accommodate and balance the competing public policy concerns of the City relative to the 911 system and the PUC's responsibility to deregulate.

Guidance as to how those interests should be accommodated and balanced is provided in the Telecom Act. Congress recognized that there would be conflicts when deregulation was implemented, and that state and local government may attempt to impede deregulation by passing legislation to impede or prohibit entry by new providers of telecommunications services. 47 U.S.C. § 253(a) provides that when such regulation prohibits entry:

No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting

the ability of any entity to provide any interstate or intrastate telecommunications service.[16]

However, also recognizing that there are legitimate state and local concerns that need to be addressed, subsection (b) also provides that state and local requirements necessary to provide for the public safety are not struck down if applied on a competitively neutral basis:

> Nothing in this section shall affect the ability of a state to impose, on a competitively neutral basis and consistent with section 254 of this section,[17] requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253(b).

 The balancing of interests set forth in this section provides us with the analog to solve the clash between these conflicting jurisdictions. Under this analog, if the City is imposing conditions on the access to the MSAG for legitimate public safety and welfare reasons rather than ignoring those concerns in the name of deregulation, the PUC is required to first give them due deference and then ameliorate any adverse impact on competition by implementing them in a competitively neutral manner. If, however, after giving the City's concerns due deference, the PUC finds that no public safety concerns are involved, the PUC can then disregard that condition in their approval of interconnection agreements.

In arriving at a competitively neutral outcome, the PUC should recognize that arrangements made between the City and Bell Atlantic before deregulation should not be considered controlling, and the City is not necessarily required to incur increased costs to foster deregulation. For example, if public safety is served by the City's imposition of a condition that no telecommunications company is to provide a copy of the MSAG to another entity, then that same requirement should be imposed by the PUC through its approval of interconnection agreements on all other telecommunications companies, including Bell Atlantic.

Because the PUC ignored the City's responsibilities under Act 78 and its public safety and welfare concerns by finding that fostering deregulation superseded those responsibilities and concerns when ordering Bell Atlantic to provide PECO with the MSAG, the decision of the PUC is vacated and the case remanded for a hearing to make findings consistent with this opinion.

### ORDER

AND NOW, this 14th day of November, 1997, the order of the Pennsylvania Public Utility Commission, dated July 14, 1997, is vacated and the case remanded to the PUC to hold a hearing and make findings consistent with this opinion.

Jurisdiction is relinquished.

---

**16.** We do not reach the validity of any provisions of the Telecom Act as it imposes requirements on state or local entities. *See Iowa Utilities Board v. Federal Communications Commission,* 120 F.3d 753 (8th Cir.1997.)

**17.** This section deals with universal service.