FOURTH DIVISION
AUGUST 31, 2006

No. 1-05-2518

| | | |
|---|---|---|
| RAMSEY EMERGENCY SERVICES, INC., | ) | Appeal from order |
| | ) | of the Illinois |
| Petitioner-Appellant, | ) | Commerce |
| | ) | Commission. |
| | ) | |
| v. | ) | No. 04-0406 |
| | ) | |
| ILLINOIS COMMERCE COMMISSION, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

JUSTICE GREIMAN delivered the opinion of the court:

Petitioner Ramsey Emergency Services, Inc. (Ramsey), appeals from an order of the Illinois Commerce Commission (Commission or ICC) denying its application to operate as a "Competitive Local Exchange Carrier" (CLEC) providing enhanced 9-1-1 emergency telephone services (E911) in Illinois. For the reasons that follow, we affirm.

Ramsey is an Iowa corporation formed in 2000 with its headquarters in Williamsburg, Iowa. In May 2004, Ramsey applied to the ICC for a "Certificate of Interexchange Service Authority" to provide interexchange facilities-based telecommunications services pursuant to section 13-403 of the Illinois Public Utilities Act (Act), to provide resold local and interexchange telecommunications services pursuant to section 13-404 of the Act, and to provide local facilities-based telecommunications services pursuant to section 13-405 of the Act. 220 ILCS 5/13-403, 13-404, 13-405 (West 2004).

E911 services transmit the caller's telephone number to the "Public Safety Answering Point" (PSAP) receiving the call and cross-reference the number in an address database to

determine the caller's location. The system then displays the caller's location on a video monitor for the 9-1-1 dispatcher, allowing him or her to direct emergency personnel to aid a caller who may not be able to audibly relate his or her location. E911 calls are transmitted on a selective router switch from the caller to a specific answering point designated by the relevant public safety agency, based on the caller's location. A call travels from the caller's home to an end office, which relays the call to the switch over selective router trunks, known as A Links. After the router switch determines which answering point ought to receive the call on the basis of the caller's location, the call is routed to the appropriate answering point over circuits known as B Links.

Illinois Bell Telephone Company (SBC Illinois), the Illinois Telecommunications Association (ITA), the St. Clair County Emergency Telephone Systems Board (Board), and the Illinois Chapter of the National Emergency Number Association (INENA) all filed petitions for leave to intervene in Ramsey's application. The administrative law judge (ALJ) granted all petitions except for the one filed by INENA.

The ALJ assigned to the case scheduled a hearing for September 2004.

In prefiled testimony, Michael Ramsey, Ramsey's president and chief executive officer attested that the company was authorized to do business in Illinois and sought to provide competitive E911 services to individual counties in the state. He stated that Ramsey was qualified to do so based on its provision of similar services to counties in Iowa, Missouri, and Nebraska, that Ramsey intended to purchase underlying A Links and B Links from facilities-based carriers such as SBC and Verizon, and would construct its own facilities for maintenance

and customer service.  He asserted that Ramsey had the requisite managerial resources to provide E911 services based on his own qualifications and those of Mark Hixson, Ramsey's vice president and chief financial officer, that Ramsey had the requisite technical resources based on its successful provision and maintenance of E911 services in several other states, and that Ramsey had the requisite financial resources based on its recent financial statements, reports, and projections.

ICC staff members filed testimony indicating that Ramsey had not submitted sufficient evidence of its financial, managerial, and technical abilities and resources to provide E911 services because it had not provided adequate answers to the staff's data requests, which specifically concerned the company's financial resources.

In response to the ICC staff's concerns over Ramsey's financial resources and suggestion that the company obtain a surety bond for each potential county it sought to service, Michael Ramsey responded that such a requirement would place an unreasonable burden on Ramsey and similar companies seeking to provide competitive E911 services in that obtaining a bond would require Ramsey to negotiate the terms of each bond with the ICC and delay its entry into the Illinois market, thereby hindering competition by limiting potential customers' freedom of contract and by impeding Ramsey's ability to market its services to other potential customers.

He also stated that Ramsey was familiar with the requisite technology inherent in E911 services and cited the company's experience in operating and maintaining a selective router, trunk lines, and accompanying hardware and software serving over 280,000 citizens of Marion County, Iowa.  He also stated that Ramsey planned to perform regular maintenance and provide

redundant facilities to reroute 911 calls in the event of service interruption and presented ICC staff with copies of the company's contingency plans and procedures.

Michael Ramsey also stated that transferring services from the current providers to Ramsey would not be problematic unless current providers failed to cooperate. He further testified that Ramsey would be able to provide the necessary infrastructure and to reconcile and maintain the software necessary to provide E911 services in Illinois, citing its successful provision of similar services to several counties in Iowa.

Hixson provided ICC staff with copies of Ramsey's financial documents, including balance sheets, income statements, earnings statements, and cash flow statements prepared by the company's accountants. He also presented *pro forma* projections of income and expenses and Ramsey's business plan. Hixson also stated that Ramsey had acquired lines of credit from some of its suppliers as well as multiple banks. He explained that, because Ramsey would be providing a limited array of services in Illinois, it would require less capital investment than traditional facilities-based telecommunications providers and would have fewer customers.

ICC staff member Robert Koch testified that he and other staff had no objections as to Ramsey's technical, financial, and managerial resources, but did express concern over the lack of a mechanism to transfer E911 services expeditiously in the event Ramsey ceased operations. Koch stated that compelling another provider to resume E911 services in such a contingency would prove difficult and that any interruption in emergency services could have dire effects on the communities Ramsey sought to serve. Koch and other staff recommended that Ramsey obtain a surety bond payable to each county it sought to serve to cover the costs of retaining the

services of a replacement carrier.

Koch further stated that the certificates allowing Ramsey to provide E911 services should be issued, but that certain conditions should be met before allowing Ramsey to begin operations. ICC staff cited to previous orders where the ICC imposed operational conditions on utility providers in order to maintain statewide standards in telecommunications services. Koch justified the imposition of such conditions on Ramsey's application because the application was unique in terms of Ramsey's funding and ability to borrow in relation to other traditional, larger telecommunications providers.

ICC staff member Marci Schroll testified that Ramsey had met the statutory requirements for certification, but that she had concerns as to the company's provision of services because Ramsey would be operating only as an E911 provider when there were no others yet operating in Illinois, which did not yet have a regulatory scheme for competitive E911 providers. Schroll recommended the ICC initiate a separate docket to evaluate whether the ICC should establish a carrier of last resort in the event that a competitive E911 carrier fails, whether tariff and rate schemes ought to be imposed for competitive E911 providers, and the overall propriety of allowing competitive E911 services in Illinois, and that Ramsey's certification not be allowed until the proposed proceedings had concluded.

Bernard Eugene Valentine of SBC testified that, in order to provide E911 services, Ramsey would need to be responsible for trunking between end offices and selective routers, the functioning of the selective router, database updates, service ordering and provisioning, backup PSAPs, and private automatic location identification services. Valentine stated that SBC was

concerned about Ramsey's ability to address a request by the ICC about contingency plans in the event of a service interruption. He also expressed concern over whether Ramsey understood some of the technology it would be responsible for providing and maintaining, Ramsey's ability to manage the transition of 911 calls from SBC customers and all the other carriers that the provision of E911 services would entail, and its ability to interface with other telecommunications providers in order to maintain updated customer databases. Valentine stated that Ramsey had not demonstrated the methods by which it would accept service orders, how it intended to provide routing to alternative PSAPs in the event of a service outage to a primary designated PSAP, or how it would negotiate with private switch operators.

Norman Forshee, the 9-1-1 coordinator for St. Clair County, testified that he was familiar with Ramsey's services and opined that, on the whole, they were superior to the services the county was currently receiving. He also stated that, if Ramsey were to provide St. Clair County with E911 services, the county would be provided with full backup facilities and more timely technical information and service than it currently experienced with SBC. He further stated that St. Clair County changed its 9-1-1 maintenance service provider from Verizon to Ramsey because of administrators' overall dissatisfaction with Verizon's responsiveness and costs.

In issuing its decision, the ICC noted that there was no statute or legal precedent directly addressing whether telecommunications carriers may legally provide competitive E911 services in Illinois. The ICC emphasized that E911 services provide life-saving protection for citizens and their property, and shared the staff's concern that any interruption in Ramsey's provision of those services could have dire consequences. The ICC stated that Ramsey had not provided a

sufficient response to the staff's questions regarding that issue and noted that there seemed to be no mechanism to secure an immediate transition to another provider in the event of a service interruption. The ICC noted that the current providers of E911 services in Illinois were larger entities with proven service records and more substantial resources than those available to Ramsey and expressed doubt as to whether Ramsey could perform backup services and provide redundant facilities as well as the more established providers could.

The ICC doubted Ramsey's financial capability to purchase the elements necessary to construct sufficient backup facilities in the areas it sought to service. The ICC also expressed concern over the sufficiency of Ramsey's answers to staff inquiries, noting that the testimony submitted on behalf of Ramsey's application often lacked sufficient details, explanations, and technical knowledge concerning several aspects of its planned operations. Based on the deficiencies it perceived in Ramsey's financial and technical resources, as well as the unresolved legality of providing competitive E911 services in Illinois, the ICC denied its application.

Ramsey filed a motion to reconsider, which the ICC denied. Ramsey now appeals, arguing that ICC's denial of its application was erroneous in that the Commission's findings are not supported by the record, that the decision was based on unlawful considerations, that the decision violates several statutory provisions, and that the Commission erred in denying INENA's motion to intervene and in issuing its decision without full consideration of Ramsey's motion for additional hearing.

Direct appeals to this court from decisions by the ICC are governed by the Public Utilities Act. 220 ILCS 5/10-201(a) (West 2004). On review, "[t]he findings and conclusions of

the Commission on questions of fact shall be held prima facie to be true and as found by the Commission; rules, regulations, orders or decisions of the Commission shall be held to be prima facie reasonable, and the burden of proof upon all issues raised by the appeal shall be upon the person or corporation appealing from such rules, regulations, orders or decisions." 220 ILCS 5/10-201(d) (West 2004).

The Act states, in relevant part, that a reviewing court shall reverse a decision of the Commission, in whole or in part, where the court determines that the Commission's findings "are not supported by substantial evidence based on the entire record." 220 ILCS 5/10-201(e)(iv)(A) (West 2004). We will set aside the Commission's decision where it appears that the Commission acted outside the scope of its authority, where it infringed on a constitutional right, or where its findings are against the manifest weight of the evidence. Illinois Power Co. v. Illinois Commerce Comm'n, 339 Ill. App. 3d 425, 434 (2003). The Commission's findings are *prima facie* evidence that an order was reasonable, but we are not obligated to believe that the facts in evidence demand a given conclusion if that conclusion is not reasonable, and we will reverse an order of the Commission if it is clearly unreasonable. Illinois Power, 339 Ill. App. 3d at 434.

Ramsey initially contends that the Commission's findings as to its financial and technical resources are not supported by substantial evidence.

For purposes of review, "substantial evidence" to support a factual finding consists of more than a mere scintilla, but may be less than a preponderance of the evidence, such that a reasoning mind would conclude that the evidence was sufficient to support a particular conclusion. Commonwealth Edison Co. v. Illinois Commerce Comm'n, 295 Ill. App. 3d 311,

No. 1-05-2518

321 (1998). In order to prevail on appeal, the party contending that the Commission's decision was not supported by substantial evidence must do more than show that the evidence supported a different conclusion, but must demonstrate that the opposite conclusion was clearly evident. Commonwealth Edison, 295 Ill. App. 3d at 321.

The Act forbids a telecommunications carrier from transacting business and from offering or providing interexchange telecommunications services in Illinois without obtaining a certificate of authority from the ICC. 220 ILCS 5/13-401(a) (West 2004). The Act provides that the Commission shall approve an application for a certificate of interexchange service authority only where the applicant demonstrates that it possesses sufficient technical, financial, and managerial resources and abilities to provide interexchange telecommunications service. 220 ILCS 5/13-403 (West 2004). The ICC is to issue certificates only on the basis of the findings addressed in section 13-403 and need not consider other factors not specifically addressed therein. Illinois Independent Telephone Ass'n v. Illinois Commerce Comm'n, 183 Ill. App. 3d 220, 237 (1988).

Ramsey contends on appeal that the testimony and documentary evidence given by Hixson served to verify the sufficiency of Ramsey's financial resources, and that Koch's and the Commission's assessments of Ramsey's finances unfairly employed elevated, more stringent standards than that prescribed under the Act. Ramsey also argues that the Commission unfairly compared its finances to those of the larger incumbent service providers when assessing financial resources, and notes that incumbent providers would be just as prone to financial instability as a provider the same size as Ramsey. Ramsey also contends that the Commission

˅9˅

improperly relied on hypothetical operational aspects of Ramsey's duties as a CLEC in assessing its financial qualifications, that the Commission incorrectly doubted Ramsey's ability to acquire the necessary equipment to provide the services it sought to perform. Lastly, Ramsey contends the contingent conditions on the eventual grant of certification recommended by ICC staff were unlawful in that such conditions were not imposed on other carriers.

Based on our own assessments of Ramsey's application materials and testimony, we find that the ICC was not remiss in denying Ramsey's application on the basis of lack of demonstrably sufficient financial resources. The evidence Ramsey submitted in support of its financial capabilities was by no means exhaustive and in some aspects borders on speculative. For instance, Ramsey attested that it would be able to purchase the equipment and facilities necessary to provide backup services, but provided no actual list of the necessary network elements or the costs thereof in projecting its bottom-line revenues and expenditures in any given scenario. Moreover, promises as to lines of credit are equally speculative, and we cannot fault the Commission for deeming them insufficient when compared to the actual possession of the required assets and cash on hand. Additionally, we find that Ramsey's seemingly piecemeal approach to providing evidence of its financial liquidity to the Commission – producing actual figures and potential itemizations only after multiple data requests from ICC staff – lends support to the Commission's findings.

Ramsey next contends that it demonstrated sufficient technical resources to merit the grant of a certificate of authority. Ramsey argues that the ICC's characterization of its approach toward establishing an operational infrastructure as "ad hoc" was inaccurate, and that Ramsey

demonstrated a sufficient capacity to either build or acquire through lease or purchase the necessary unbundled network elements (UNEs) to establish the required network. Ramsey relies on this court's decision in Globalcom, Inc., v. Illinois Commerce Comm'n, 347 Ill. App. 3d 592 (2004), for the propositions that CLECs can lease network elements from an incumbent provider on an unbundled basis in order to provide competitive telephone service and that the Public Utilities Act requires incumbent providers to bundle network elements to lessees that they would normally bundle themselves. Globalcom, 347 Ill. App. 3d at 596.

We note that our decision in Globalcom dealt with the allegedly anticompetitive behavior of an incumbent telecommunications service provider as to a CLEC seeking to provide competitive services in the same market, not with a denial of a prospective carrier's application for certificate of authority. While we make no quarrel with Ramsey's assertion that it could indeed acquire the network elements it would need to operate as CLEC by purchasing or leasing either the individual or bundled elements from incumbent carriers, we fail to see how its reliance on Globalcom bolsters its arguments on appeal.

Ramsey also relies on the Commission's grant of a certificate of authority to Intrado, Inc., a telecommunications service provider that sought to provide E911 services as a CLEC to an incumbent provider, SBC Illinois. See In re Intrado, Inc., No. 00-0606 (September 14, 2000). We find the scenarios addressed in Ramsey's and Intrado's applications distinguishable. In its application, Intrado sought rights of interconnection, collocation, and access to network elements in order to augment existing 911 infrastructures; it did not seek to operate as an independent provider of E911 services to a municipality, as does Ramsey. Accordingly, we find that the

No. 1-05-2518

Commission's decision regarding Intrado is not analogous to the scenario before us.

What the Commission took issue with, mainly, was not so much Ramsey's hypothetical ability to construct or acquire the elements necessary to establish a service network but, rather, its failure to specify with precision the exact network elements it would have to construct or acquire in order to provide E911 services, and to state with specificity what the acquisition of those elements would likely cost. We do not find it unreasonable that the ICC expressed concern over Ramsey's technical capabilities on that basis, as a failure to state exactly which elements a provider would need to establish service in a given area could indicate a lack of awareness as to what those elements are. Furthermore, Ramsey failed, in several instances, to provide concrete answers to inquiries from staff and intervenors which addressed certain contingencies Ramsey would likely encounter in establishing, providing, and maintaining E911 services in St. Clair County. We therefore conclude that the ICC's denial of Ramsey's application for a certificate of authority on the bases of its financial and technical resources was not in error.

Ramsey insists that its experience providing similar services in other jurisdictions and the testimony of its past and prospective customers are persuasive evidence of its technical ability to provide E911 services in Illinois. As is indicated by the record, and as is unrebutted by Ramsey, the services Ramsey provided in Iowa, while of a similar nature to those it sought to provide in Illinois, were much smaller in terms of scale and sophistication. Furthermore, there was no indication from the record that the customers from whom Ramsey elicited testimony were experts on the statutory technical requirements for a telecommunications carrier to provide E911 services in Illinois. Accordingly, we cannot conclude that the ICC erred in discounting such

No. 1-05-2518

evidence.

Ramsey next contends that the Commission's denial of its application was based upon unlawful considerations, specifically the speculative fear that its operations would fail and emergency services could be interrupted, policy considerations outside statutory standards, and the improper assumption that Ramsey will violate the law. We do not agree.

While Ramsey is correct in it assertion that the Commission is only to consider factors elucidated in the statute in determining whether to grant a certificate of authority (see Illinois Independent Telephone Ass'n, 183 Ill. App. 3d at 237), the possibility of service interruption was not the sole basis for the ICC's decision and, we believe, was germane to the Commission's deliberations.

As we have already discussed, the Commission specifically addressed statutory grounds, *i.e.*, the sufficiency of Ramsey's financial and technical resources, in denying the application for certificate of authority. Moreover, the Commission's reservation as to the possibility of an interruption in service, while obviously a hypothetical, was nevertheless a legitimate concern and one for which Ramsey could reasonably be expected to generate a contingency plan. The safety of the public a carrier seeks to serve should be of paramount importance in the provision of E911 services and in the evaluation of a particular carrier's ability to do so.

A Pennsylvania court in City of Philadelphia v. Pennsylvania Public Utility Comm'n , 702 A.2d 1139 (Pa. Commw. 1997), dealt with aspects of competitive telecommunication service regulations similar to the ones we encounter here. In that case, the City of Philadelphia had contracted with Bell Atlantic to provide the city's E911 services. Under Pennsylvania law, the

city was required to maintain a master street address guide of all its residents and contracted with Bell Atlantic to generate and maintain the list. Bell Atlantic entered into an interconnection agreement with PECO Hyperion Telecommunications, a CLEC, as required under the federal Telecommunications Act of 1996 (Telecom Act), to provide dialing parity and nondiscriminatory access to established telecommunication exchanges in order to foster competition in the provision of telecommunication services. City of Philadelphia, 702 A.2d at 1141-42; see 47 U.S.C. cc 251(a), (b) (1994 & Supp. II 1996). Bell Atlantic planned to provide PECO with the master list pursuant to the agreement. Bell Atlantic sought permission from the city to disclose the list, and the city insisted on certain conditions before disclosure, including testing of the 911 system, indemnification, and agreements to maintain the physical 911 systems and insurance thereof. PECO rejected the conditions and the city refused to allow Bell Atlantic to disclose the master list. Bell Atlantic thereafter sought a declaratory order from the Pennsylvania Public Utility Commission (PUC) directing Bell Atlantic to share the master list with PECO. The PUC granted Bell Atlantic's request, and the city appealed.

The Commonwealth Court reversed, relying on subsection 253(b) of the Telecom Act, which provides that state utility regulators may impose on telecommunications carriers requirements necessary to preserve and advance universal service, protect public safety and welfare, ensure the continued quality of services, and safeguard the rights of consumers, provided such requirements are imposed on a competitively neutral basis. 47 U.S.C. c 253(b) (1994 & Supp. II 1996); City of Philadelphia, 702 A.2d at 1145. The court found that the PUC ignored the city's safety and welfare concerns by compelling Bell Atlantic to tender the master

list to PECO, and allowed its concerns for fostering competition to supersede its obligations to consider public safety and welfare. The court vacated the PUC's order and remanded for a hearing to consider the merits of the city's conditions. City of Philadelphia, 702 A.2d at 1145.

Similarly, we conclude that the imposition of certain conditions or standards on a carrier's grant of authority out of concern for public safety is not unlawful, seeing as the very purpose of providing E911 services is the protection of the public the provider seeks to serve. Accordingly, we find that the Commission was not remiss in citing the possibility of service interruption in rejecting Ramsey's application.

Ramsey next contends that the Commission's decision violates the statutory delegation of authority to emergency telephone service boards (ETSBs) to develop E911 plans. Ramsey cites to the Emergency Telephone System Act for the proposition that ETSBs, not the ICC, are statutorily responsible for planning, establishing, maintaining, upgrading, adopting specifications, and making expenditures for E911 systems. 50 ILCS 750/15.4 (West 2004). Ramsey also points out that ETSBs, not the ICC, have the authority to contract with carriers providing E911 services.

We take no issue with this provision, only with Ramsey's interpretation of it. The statute Ramsey relies on does not address the statutory eligibility or authority of an entity to provide E911 or other interexchange telecommunication services. That is the issue here, not the ETSBs' authority to deal with the carriers once their eligibility has been established. Ramsey's argument here is, at best, a *non sequitur*.

Ramsey next contends that the ICC's order violates the requirements of the Universal

No. 1-05-2518

Telephone Service Protection Law of 1985, a subsection of the Public Utilities Act and the relevant provision in this case (220 ILCS 5/13-100 *et seq.* (West 2004)), in that the ICC unlawfully included additional and unspecified requirements beyond findings of sufficient financial, technical, and managerial resources on behalf of an applicant seeking authority to operate as a CLEC. Ramsey cites authority that delineates the statutory powers of the Commission, but fails to specify how its authority has been exceeded or how the authority it relies on applies in this context. Without more, we see no need to analyze this argument.

Ramsey next contends that the Commission's decision is preempted by the federal Telecom Act in that it prohibits or has the effect of prohibiting Ramsey's ability to provide any interstate or intrastate telecommunications service, in violation of section 253(a) of the Telecom Act. 47 U.S.C. ç 253(a) (1994 & Supp. 1996). Ramsey relies on the federal district court's decision in Qwest Corp. v. City of Santa Fe, 224 F. Supp. 2d 1305 (N.M. 2002), *aff'd in part, rev'd in part, & remanded*, 380 F.3d 1258 (10th Cir. 2004), for the proposition that local regulations and the authorities that enforce them may not exercise unfettered discretion that operates to exclude potential carriers from providing telecommunications services in a given area and serves to inhibit competition.

We draw Ramsey's attention to the paragraph immediately following section 253(a), which expressly states that the Telecom Act does not affect the ability of states "to impose on a competitively neutral basis *** requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers." 47 U.S.C. ç 253(b) (1994

ˇ16ˇ

& Supp. II 1996). We do not believe that the Commission's statutory authority to grant certificates of authority on the bases of applicants' financial, technical, and managerial resources grants the Commission "unfettered discretion" to the degree that it hinders competition in Illinois. The Telecom Act does not mandate that providers be allowed to provide services in a given market where they may not be financially, technically, or managerially qualified to do so. If Ramsey were found to have sufficient resources to perform the services it seeks to provide, it would be free to offer and provide those services in Illinois on a competitive basis.

We agree with the court in City of Philadelphia in that we perceive no prohibition against state authorities imposing on telecommunications carriers requirements necessary to preserve public service, protect public safety, ensure service quality, and safeguard consumers' rights. City of Philadelphia, 702 A.2d at 1145. We believe that requiring providers to possess sufficient resources before offering their services in Illinois does not amount to unfettered discretion to such a degree that the requirement prohibits competition in this state. Accordingly, we reject Ramsey's argument as to federal preemption.

Ramsey lastly offers two procedural arguments, specifically that the Commission improperly issued its final order on the merits prior to full consideration of Ramsey's motion for an additional hearing and that the Commission erred in denying INENA's motion to intervene.

Ramsey argues that the ICC violated its own procedural rules when it issued its final order on the merits of Ramsey's application while Ramsey's motion for rehearing was still pending. Ramsey contends that the issuance of the order violated section 200.520(a) of the Illinois Administrative Code, which grants a party seeking review of an agency ruling to file a

petition for interlocutory review within 21 days of the ruling's issuance (83 Ill. Adm. Code ƈ 200.520(a), as amended by 20 Ill. Reg. 10607 (eff. August 15, 1996)) and effectively deprived Ramsey of its due process right to an interlocutory appeal. In support, Ramsey offers the Commission's remarks at the time of Ramsey's initial application in 2000 that the case was an issue of first impression in that no telecommunications carrier had sought to provide competitive E911 services in Illinois before. After learning that the ICC had approved of Intrado's interconnection agreement with SBC Illinois, Ramsey sought to rely on the Commission's decision as additional authority and to examine the parties involved in that proceeding in its motion for rehearing. Ramsey now contends that the Commission's issuance of its final order while the motion was pending deprived Ramsey of the opportunity to submit substantive new evidence in favor of it application. We do not agree.

We have already pointed out that Intrado sought to provide services quite distinct from and on a much narrower scale than those Ramsey seeks to provide, and that Intrado sought to provide its services to an incumbent telecommunications provider, not to a municipality responsible for the safety and welfare of its citizens. Having already determined that the issues addressed in the Intrado proceedings are inapplicable to those before us, we find that the Commission's issuance of its final order while Ramsey's motion for rehearing was pending was not in error.

Lastly, Ramsey contends that the Commission abused its discretion in denying INENA's motion to intervene, arguing that INENA had a clear and compelling interest in the proceedings involving Ramsey's application and that the motions to intervene that the Commission granted

were facially and substantively flawed. Ramsey neglects to mention that INENA only filed its motion to intervene after the record had been closed and just after the ALJ issued a proposed final order, while the other petitions to intervene were filed nearer the time of Ramsey's initial application.

A court or agency may grant intervention either permissively or as a matter of right. People ex rel. Hartigan v. Illinois Commerce Comm'n, 243 Ill. App. 3d 544, 547 (1993). A party may intervene in a proceeding where a statute grants the unconditional right to do so, where the party will likely be bound by an order or judgment resulting from the proceeding and will not be adequately represented by the original parties, or when the party will be adversely affected by the distribution or disposition of property as a result of the proceeding. 735 ILCS 5/2-408(a), (b) (West 2004). Intervention is usually allowed only before judgment issues, and parties may not normally seek intervention after the rights of the existing parties have been determined and a final decree entered. In re Estate of Barth, 339 Ill. App. 3d 651, 661 (2003). The decision to allow or deny intervention is within the discretion of the court or agency and will not be overturned on review absent an abuse of that discretion. In re Estate of Barth, 339 Ill. App. 3d at 661.

Here, INENA filed a petition to intervene after Ramsey's application proceedings were already well underway, evidence had been closed, and the ALJ assigned to the case had already issued a proposed final order. The petition to intervene was far from timely. Furthermore, unlike the other petitions to intervene that the Commission granted, INENA's petition had little to do with the crux of the proceedings, *i.e.*, whether Ramsey possessed sufficient financial,

technical, and managerial resources to merit the grant of a certificate of authority to operate as a CLEC, and focused more on the broader, less tangible issue of allowing potential carriers to provide E911 services on a competitive basis and the likely effect the allowance of such competition would have on Illinois telecommunications carriers and the consuming public.

The resolution of the relative merits of competing economic and market theories was not the Commission's task in this case. Rather, its task was to grant or deny Ramsey's application for certificate of authority on the merits of its financial, technical, and managerial resources, just as the statute demands. Having argued that policy considerations have no place in Commission proceedings concerning certificates of authority, Ramsey is hardly in a position now to advocate their inclusion. Because INENA's petition to intervene was not timely and had little bearing on real issues the Commission was charged with deciding, we find that the Commission did not abuse its discretion in denying the petition.

For the reasons set forth above, we affirm the Commission's denial of Ramsey's application for certificate of authority.

Affirmed.

QUINN, P.J., and CAMPBELL, J., concur.