NORTHERN MORAINE WASTEWATER RECLAMATION DISTRICT, Petitioner, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

Second District   No. 2—07—1080

Opinion filed June 12, 2009.

544

Nancy J. Rich, Laura A. O'Connell, and Monica J. Mosby, all of Katten Muchin Rosenman LLP, of Chicago, for petitioner.

John P. Kelliher, of Illinois Commerce Commission, of Chicago, for respondent Illinois Commerce Commission.

Phillip A. Casey and Anne W. Mitchell, both of Sonnenschein, Nath & Rosenthal LLP, of Chicago, for respondent Rockwell Utilities, LLC.

JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Northern Moraine Wastewater Reclamation District (the District), appeals from an order of the Illinois Commerce Commission (ICC) granting a certificate of public convenience and necessity to respondent Rockwell Utilities, LLC (Rockwell), to provide wastewater treatment services to parcels (the subject area) in the Village of Lakemoor (Village) in Lake County, Illinois.

On appeal, the District raises issues of law and fact. Specifically, the District argues: (A) the ICC's order was erroneous because: (1) the order violated the Clean Water Act of 1977 (CWA) (33 U.S.C. §1251 *et seq.* (2006)) because Rockwell was not the designated management agency (DMA) for the subject area; (2) the subject area was within the District's designated management area and thus the District was the DMA with authority to provide wastewater treatment services to the subject area; (3) the order erroneously concluded that the ICC had no authority to deny Rockwell's request for a certificate of public convenience and necessity, because the Illinois Environmental Protection Agency (IEPA) issued permits to Rockwell; (4) the District was not estopped from asserting that it was the DMA and thus must serve the subject area; and (5) the ICC had a duty to consider and follow federal law; (B) the ICC's authority was preempted under principles of conflict preemption in that: (1) conflict preemption applied because Rockwell and the District cannot both provide wastewater treatment services to the subject area; (2) the ICC's order was arbitrary and capricious because it erroneously ignored the controlling federal law and provided that the ICC was not required to consider the controlling federal law in deciding whether to issue the certificate; (3) Rockwell's wastewater treatment system was not exempt from the CWA's requirements for wastewater treatment; and (4) there was and is no emergency requiring or supporting the grant of a temporary certificate to Rockwell; (C) the ICC's finding that Rockwell was the least-cost option for providing water and wastewater treatment services to the subject area was not supported by substantial evidence in that: (1) the ICC's conclusion that Rockwell satisfied the requirements of section 8—406 of the Public Utilities Act (Utilities Act) (220 ILCS 5/8—406 (West 2006)) was erroneous because it was unsupported by the evidence presented; and (2) the ICC's conclusion that Rockwell was the only entity capable of providing services to the subject area was erroneous because it was unsupported by fact; (D) the ICC erroneously required the District to prove that it was the best option; and

(E) the ICC improperly struck the District's brief on exceptions and almost all of its testimony and, therefore, the order was arbitrary and capricious in that it was based on an incomplete record. We affirm.

## I. BACKGROUND

In its order, entered on August 15, 2007, the ICC issued a certificate of public convenience and necessity to Rockwell to provide water and sewer services to the subject area. The ICC found that: (1) public convenience and necessity required Rockwell's water and sewer service in the subject area; and (2) issuance of the certificate to Rockwell would promote the public convenience.

The case was initiated on July 24, 2006, when Rockwell filed with the ICC a petition for a temporary certificate of public convenience and necessity (emergency petition) (docket No. 06—0523) to provide water and sewer services to the subject area, pursuant to section 8—406(e) of the Utilities Act (220 ILCS 5/8—406(e) (West 2006)). Rockwell served a copy of its petition on all municipalities within $1\frac{1}{2}$ miles of the subject area, pursuant to Title 83, section 200.150, of the Illinois Administrative Code (83 Ill. Adm. Code §200.150, amended at 24 Ill. Reg. 16019, eff. October 15, 2000). Rockwell also served a copy of its petition on all water and sewer utilities within a reasonable distance of the subject area and those entities already parties to the proceedings. The ICC granted Rockwell's emergency petition in an interim order on August 16, 2006.

Rockwell also filed a petition (docket No. 06—0522) requesting a permanent certificate, as well as certain other relief not at issue in this appeal, pursuant to section 8—406 of the Utilities Act (220 ILCS 5/8—406 (West 2006)). The two dockets were consolidated by the administrative law judge (ALJ).

On August 31, 2006, the District filed a petition for leave to intervene, which was granted by the ALJ. While the District's petition was pending, the District filed a verified application for rehearing of the ICC's grant of Rockwell's emergency petition. The District also filed a motion to stay enforcement of the grant of the emergency petition.

In its petition for leave to intervene, the District alleged that the District is a municipal corporation located in McHenry County, Illinois, organized pursuant to the Sanitary District Act of 1917 (70 ILCS 2405/1 et seq. (West 2006)). The District also alleged that it has been the DMA for sewage treatment services for the entire Island Lake/Northern Moraine District Facilities Planning Area, comprising portions of McHenry and Lake Counties, since 1976. The District alleged that the CWA and the Illinois Environmental Protection Act

(415 ILCS 5/1 *et seq.* (West 2006)) set out detailed procedures for revising the Illinois Water Quality Management (WQM) plan approved pursuant to the CWA, such as by taking authority away from a DMA. The District alleged that Rockwell failed to obtain the required approvals to revise the WQM plan to take away the District's DMA authority for the subject area. The District asserted that it was constructing major sewer interceptors and facilities that would serve additional areas of the Village, including land immediately adjacent to the subject area, at an estimated cost in excess of $19 million. The District alleged that, before Rockwell could obtain a certificate from the ICC, it was required to revise the WQM plan to remove the District's authority to serve the subject area. On September 26, 2006, the ALJ denied the District's verified application for rehearing of the ICC's grant of Rockwell's emergency petition and the District's motion to stay enforcement of the grant of the emergency petition.

Rockwell is an Illinois limited liability company formed in December 2005 by Kirk Corporation (Kirk), a large northern Illinois homebuilder and Rockwell's sole member. Rockwell filed an amended petition for a permanent certificate on February 23, 2007, and, at the direction of the ALJ, also filed a revised amended petition for a permanent certificate on April 16, 2007, which was served upon the parties. The revised petition essentially sought a permanent certificate to serve property purchased by Kirk, as well as surrounding property owned by other investors, in the subject area. In particular, the revised petition requested that the ICC: (1) grant a permanent certificate to provide water and sewer services to the subject area; (2) approve the general terms and conditions for the services; (3) approve the accounting entries related to Rockwell's acquisition of the water and sewer facilities of the subject area; (4) approve certain affiliated interest agreements; (5) authorize Rockwell's initial equity and debt financing; and (6) authorize Rockwell's refinancing of certain debt.

The subject area consisted of certain real estate commonly referred to as the "Sullivan Lakes Parcel," which included property owned by Kirk, Lakemoor Building Corporation (Lakemoor), and other investors, including JRC Lakemoor Investments Limited Partnership (Jupiter Investments) and JRC Lakemoor Development Company, LLC (Jupiter Development). Lakemoor, a private utility, served the Jupiter Apartments, located in the subject area, for 20 years, from 1987 to January 2007, after receiving permits from the IEPA.

The main witness on behalf of Rockwell was John P. Carroll, Kirk's president and chief executive officer. Carroll testified in October 2006 regarding Rockwell's agreement with Lakemoor to purchase the water and wastewater assets that Lakemoor was using to provide services to

certain locations within the subject area. Lakemoor had difficulties providing services to the subject area, and Rockwell took steps to remedy the issues and improve the services. Carroll testified regarding Rockwell's proposed financing and equity and debt refinancing, which would occur within 12 months of approval of its amended petition.

Carroll testified that Rockwell had sufficient capacity to serve the subject area or could make enhancements to its system, if required. Rockwell was providing water and sewer services in the subject area to 496 customers in the Jupiter Apartments, 34 single-family homes, and 44 townhomes in the Sullivan Lakes Parcels. Carroll outlined potential additional developments in the subject area and Rockwell's ability to serve these additional developments. Carroll also outlined several techniques Rockwell could employ to increase capacity without expending substantial capital.

Carroll testified that Rockwell acquired the Lakemoor system for a purchase price equal to the available capacity of the system multiplied by $5,000, but not to exceed $3,535,000, as set forth in the asset purchase agreement with Lakemoor. The system's available capacity was equal to the number of homes that may be served by the system, as determined by the IEPA and/or the ICC, over time. The available capacity may increase, subject to the determination of the IEPA, as set forth in the asset purchase agreement. Accordingly, at closing, Rockwell made a down payment to Lakemoor of $1,825,000 with a letter of credit for $1,710,000, totaling the maximum purchase price ($1,825,000 + $1,710,000 = $3,535,000). Based on IEPA determinations over time of the system's available capacity, Rockwell's letter of credit would be drawn upon to increase the purchase price payment to Lakemoor.

Carroll testified that Rockwell sought the certificate because no entity, other than Lakemoor, offered immediate availability of water and sewer services to the subject area. Further, the transfer of Lakemoor's assets to Rockwell was in the public's best interest, since Rockwell was formed to serve an area within the Village that was not served by any municipal or public utility. The Village was not immediately prepared to, or interested in, extending either water or sewer service to the subject area. No public utility or nearby water or sanitary district was prepared to provide both water and sewer services to the subject area.

Carroll testified that Lakemoor wanted to exit the utility business because its principal shareholder was physically unable to attend to the day-to-day operations, due to out-of-state confinement. Also, the IEPA had serious concerns about the manner in which Lakemoor operated the system. For example, the IEPA served a violation notice

charging Lakemoor with failure to use a certified operator and failure to submit monthly reports. After entering into the asset purchase agreement, Rockwell assisted Lakemoor in retaining the necessary experts to bring the system into IEPA compliance and obtain capacity and operational permits. With Rockwell's recommendations and financial assistance, the IEPA reissued Lakemoor's permit to operate on July 31, 2006, and issued Lakemoor and Kirk several permits to construct, own, and operate beginning July 7, 2006. Carroll opined that Lakemoor's customers had already benefitted from Rockwell's involvement and would continue to benefit from the safe and reliable water and sewer services that would result from the system's change in ownership. Further, the IEPA had issued Rockwell a permit to operate the wastewater facility on February 7, 2007.

Carroll further testified that Rockwell's customers would benefit from the management experience and financial strength that Rockwell brought to the system. Rockwell had the technical, financial, and managerial ability to operate and maintain the system. Rockwell would not retain Lakemoor's primary operator or any Lakemoor employees. Instead, it would hire MGD Water Systems, Inc. (MGD), for the day-to-day operations of the system. At Rockwell's insistence, prior to Rockwell's acquisition of the system, MGD was retained to conduct testing and provide operational support to comply with IEPA requirements. MGD also provided water and wastewater treatment expertise.

Carroll testified that MGD's principal, Michael Megurdician, would lead the operation management team. Megurdician had over 20 years of utility plant operation experience with the City of Rockford Water Utility, including 16 years as its well facility unit manager. He was a Class-A certified water treatment operator and a Class-4 certified wastewater treatment operator. MGD had been in business since 1989 and currently employed six people. It provided water and wastewater plant operation assistance to the Village of Pingree Grove, the Village of Creston, Woodlawn Utilities, and Beacon Hill/Great Oaks Apartments.

Carroll also testified regarding the experience of LinTech Engineering, which Rockwell had hired. LinTech would assist Rockwell with engineering, IEPA compliance, and permit issues. LinTech had over 30 years of water and wastewater treatment facilities planning and design experience. LinTech provided water and wastewater plant engineering assistance to the Village of Pingree Grove, the Village of Huntley, the Village of Hinckley, the Village of Fox River Grove, the Village of Deerfield, the City of Bensenville, the City of Elmhurst, and the City of Carol Stream. In addition, LinTech engineered new water treatment plant and improvement projects for the Village of

Pingree Grove, the Village of Huntley, and the Village of Gilberts. Lin-Tech also worked with Illinois-American Water Company on multiple water treatment and wastewater treatment projects.

Regarding Rockwell's financial capabilities, Carroll testified that Kirk had 2005 revenues in excess of $134 million and expected 2006 revenues to exceed $100 million. Kirk's assets were worth nearly $100 million and its equity was in excess of $40 million. On average, Kirk had a $30 million line of credit. Because of its low leverage-to-equity position, Kirk had significant capital available to fund and operate Rockwell.

Regarding managerial capability, Carroll testified that he would be assisted by several other experienced people, including Mike Albach, who was a certified public accountant and had more than 23 years of financial experience. Albach had been Kirk's vice president and chief financial officer since 1998. In those positions, Albach was responsible for Kirk's general ledger and profit and loss statement and for interfacing with lenders and auditors. Albach supervised a staff of eight and had an annual budget of over $5.7 million. Before joining Kirk, he worked for 14 years as an auditor for several certified public accounting firms.

Carroll testified that he would also be assisted by Lon Marchel, who had more than 30 years of construction and real estate development experience. He had been a vice president and regional manager for Kirk since 1994. Marchel was responsible for overseeing, maintaining, purchasing, and installing public utility plant equipment and infrastructure. Marchel supervised a staff of 20 and had an annual budget of over $60 million. Before joining Kirk, Marchel worked for over 17 years for Centex Homes, where he became vice president of construction, and for Town & Country Homes, where he worked as a project manager.

Carroll testified that Paul Rose would also assist him. Rose had worked at Kirk as vice president of land acquisition and development since 2004. He had over 25 years of construction and real estate development experience. He supervised the acquisition staff and Kirk's engineering and consulting companies involved in acquisitions. His annual budget in 2006 was in excess of $17 million. Rose was responsible for analyzing and verifying utility systems and real property acquisitions. Before he was vice president, he was regional manager with Kirk. Prior to joining Kirk, he worked for Four Oaks Development as vice president of construction and as project manager for Centex Homes.

Jeremy Lin, managing principal at LinTech, testified on Rockwell's behalf. Lin testified regarding Rockwell's original cost study of

plant in-service depreciation rates, capacity to serve projected growth, and the cost of additions to the water and sewer systems necessary to serve projected growth. Lin described the system as consisting of both water and sewer assets. The water system's assets consisted of (1) a water treatment facility; (2) a 1-million-gallon elevated storage tank; (3) three pumps; (4) approximately 13,745 linear feet of mains of various sizes along with related valves; and (5) fittings, blow-offs, and fire hydrants. The sewer system assets included: (1) a wastewater treatment facility; (2) approximately 10,082 linear feet of mains of various sizes along with related valves; (3) fittings and blow-offs; (4) a spray irrigation system; (5) a raw sewage pump station; (6) a two-cell aerated lagoon; and (7) a pumping station. Lin opined that, based on available records, the original cost of the system was best estimated to be $4,916,619. He also testified that Rockwell added $100,449 in improvements to the wastewater facilities.

ICC staff witness Janis Freetly testified that, pursuant to section 8—406(b)(3) of the Utilities Act (220 ILCS 5/8—406(b)(3) (West 2006)), Rockwell was capable of financing the operation and maintenance of the facilities, due to Kirk's obligation to provide Rockwell with debt and equity capital in accordance with the operating agreement. Freetly testified:

> "Rockwell is capable of financing the operation and maintenance of the water supply and sanitary sewer facilities for which certification is requested in this proceeding. In addition since the developers will fund all additions to the water and sewer systems without refund, the construction of new facilities will not have adverse financial consequences for the utility or its customers."

ICC staff witness Thomas Q. Smith testified that Rockwell was the only entity that currently had facilities capable of providing adequate, reliable, and efficient water and sewer services to the subject area. When asked whether he knew of any other utility with the capacity to serve the subject area, Smith replied:

> "I am aware that [the District] is challenging [Rockwell's] authority to provide sewer service in the area at issue in this Docket. *** I have seen no convincing evidence that [the District] currently possesses the assets that are required to provide immediate sewer service in the service area at issue."

Smith testified that Rockwell met its burden under section 8—406(b) of the Utilities Act and that the District presented no information that he considered relevant to his analysis of this issue. Smith testified that it was his understanding that the District had no operating system within the subject area. Smith did not inspect any of the District's assets. He familiarized himself with the location of the

District's collection mains, as the information was given to him by Rockwell personnel. He also sent several data requests regarding the District's capacity and financial information relating to its ability to provide service and the cost of providing service.

David Monie, president of G.P.M. Associates, Inc., a water engineering and management consulting firm, testified that he had founded G.P.M. and had been its president since 1976. He was a licensed professional engineer and had many years of experience with rate increase applications. He had provided rate studies, cost of service studies, and tariff designs in seven states, including Illinois, and for several subdivisions, investor-owned water companies, municipal systems, and other water authorities. Monie had also prepared original cost studies for several water utilities. G.P.M. operates two small water utilities of its own.

Monie testified that Rockwell's water distribution and sewer collection systems would be funded by developers. He testified that, although there would be an acquisition adjustment, it would not affect the base rate or the operating expenses of the system, because Rockwell plans to amortize it over a 20-year period, using a "below-the-line" account. Monie testified that this was the proper procedure because it "prevents an impact on rates."

Mike Albach, vice president and chief financial officer of Kirk, testified as to journal entries relating to Rockwell's acquisition of Lakemoor's water and wastewater treatment assets. Albach testified that he was a certified public accountant.

The ICC admitted into evidence Rockwell's confidential independent auditor's report showing its substantial net worth.

Exhibits were admitted showing that Lakemoor had provided wastewater treatment services for the Jupiter Apartments since 1987. The IEPA had conducted a site-specific review of technical specifications and operating requirements for the proposed operations, an onsite inspection of the plant, and a review of area-wide water quality impacts. The IEPA had then issued Lakemoor permits to operate and construct from 1987 to 2007. Further, the IEPA had issued Rockwell permits.

An admitted IEPA permit described the Lakemoor/Rockwell system as a spray irrigation system. An admitted IEPA letter stated that the "decided advantages" of a spray irrigation system were that there would be "no requirement to amend that applicable Area-wide Water Quality Management (208) Plan" and "[n]o requirement for a national pollutant discharge elimination system permit." The system used treated water for irrigation. The treated water was dispersed through subsurface (no deeper than three inches) and did not enter either the groundwater or surface water.

In 1973, the Lakemoor spray irrigation system obtained siting approval. On July 14, 1983, the Village annexed, zoned, and approved a planned unit development (PUD) through an annexation agreement. The PUD enveloped the subject area. The annexation agreement authorized Lakemoor to construct a sewage treatment plant, sewer lines, and a complete water system to service the PUD.

Rockwell and the ICC staff filed motions to strike certain testimony of the District's witnesses; namely, all of the testimony of the District's president, Kenneth Michaels, and the rebuttal testimony of the District's financial expert, George Roach, and certain testimony of the District's engineering expert witness, Robert Scott Trotter. The motions alleged that Michaels had filed an appearance in the case and could not testify and act as counsel simultaneously and that his testimony constituted improper legal opinion.

The motions alleged that Roach's rebuttal testimony concerned an accounting issue testified to by Rockwell's witness Monie. Roach referred to certain accounting exhibits that all related to Rockwell's request for a rate increase. The ALJ subsequently determined that Rockwell's request for a rate increase would not be considered in the instant proceeding and ordered Rockwell to refile its direct testimony. Thus, in their motions to strike, Rockwell and the ICC staff argued that Roach's rebuttal testimony should be stricken because it related to the rate increase issue, which had been stricken by the ALJ.

Rockwell argued that Trotter's rebuttal testimony improperly raised new issues not discussed by Rockwell's witness Lin and that Trotter admitted that his testimony rebutted Lin's testimony. The ALJ granted Rockwell's and the ICC staff's motions.

The following testimony of Michaels was stricken. Michaels testified regarding the District's authority to provide wastewater treatment to the subject area. He also testified regarding the District's most recent facility plan amendment, which summarized the District's history since 1976 as the DMA for the entire Northern Moraine Wastewater Reclamation District, including the subject area.

Michaels testified that the District had the capacity to serve the subject area. In response to questioning as to whether the District intended to construct sewage collection facilities to serve the subject area, Michaels testified:

"The District currently owns and operates sanitary sewers located very near the subject property. There is a sewer with available capacity located on Wagon Trail Court in the Village of Lakemoor [250 feet from the subject property]. A larger interceptor sewer with substantial excess capacity, capable of serving what appears to be the entire proposed Rockwell development lies within ap-

proximately one-half mile of the geographical area and could be readily extended to serve the subject property. The existing lift stations that serve the Northeastern Drainage Basin and the Northwestern Drainage Basin have the capacity to serve an additional 3,845 P.E. [population equivalent]. These stations pump to a 24" diameter gravity sewer located at Illinois Route 176 in the Village of Island Lake. This sewer currently has a capacity to serve an additional 6,500 P.E."

Trotter testified, on surrebuttal to Rockwell's rebuttal, to facts showing that Rockwell's proposed wastewater treatment facility did not possess sufficient treatment and disposal capacity to serve the subject area. This testimony was stricken as out of order with the testimony schedule set out by the ALJ.

The following testimony of Trotter's was not stricken. Trotter testified regarding the District's status as a DMA and his knowledge and experience with the CWA's requirement of a WQM plan establishing designated planning areas and facility planning areas. Trotter testified that the District had the capacity to serve the subject area. He testified that the District had the economic wherewithal to own, operate, and maintain a potable water supply and the necessary equipment. He also criticized Rockwell's projected expenses.

The following testimony of Roach was stricken. Roach testified that on the existing rate structure it would be impossible for Rockwell to pay down the debt it would owe Kirk and that, therefore, it would not be feasible for a party other than Kirk to step in to assume the debt and still operate the system. Roach testified that Rockwell would have to either significantly increase rates to cover operations and debt repayment or declare and file bankruptcy. If Rockwell filed bankruptcy, the District, as the DMA for the subject area, would be saddled with the financial burden of either taking over the operations of Rockwell's facility or finding a comparable solution. Either option would result in significant rate increases for the entire area, not just the users of the Rockwell system.

The parties filed initial and reply briefs. The ICC released its proposed order on July 5, 2007. The District filed a brief on exceptions and Rockwell filed a reply. The ICC entered its final order, striking the District's brief on exceptions and granting Rockwell's petition for a certificate of convenience and necessity to serve the subject area.

The ICC found that: (1) Rockwell was the only entity that currently had the facilities capable of providing water and sewer services to the subject area; (2) the District provided no evidence that it, or any other entity, could provide services to the subject area at less cost to consumers; (3) Rockwell was capable of financing the operation and

maintenance of the water supply and sanitary sewer system and had been able to acquire the system and to construct new facilities without significant adverse financial consequences for the utility or its customers; (4) Rockwell had the requisite technical and managerial capabilities to provide services to the subject area; and (5) Rockwell had satisfied the requirements of section 8—406 of the Utilities Act for the issuance of a certificate of public convenience and necessity, subject to certain conditions found appropriate by the ICC.

The ICC expressly considered and rejected the District's claim that the ICC did not have the authority to grant Rockwell's requested relief. The ICC noted that, where Congress is regulating "in a field which the States have traditionally occupied," courts "start with the assumption" that the State's authority is "not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Regarding the District's position that the IEPA's issuance of permits to Rockwell was in direct conflict with the CWA and that the ICC thus should refuse to act on Rockwell's petition, the ICC reasoned that this was the wrong forum for that argument. The ICC stated that it had no authority to review IEPA decisions in its area of expertise. Rather, the ICC was charged only with the enforcement of the Utilities Act and its regulations. The ICC denied the District's application for rehearing. This timely appeal followed.

## II. ANALYSIS

On appeal, the District argues: (A) the ICC's order was erroneous because: (1) the order violated the CWA (33 U.S.C. §1251 et seq. (2006)) because Rockwell was not the DMA for the subject area; (2) the subject area was within the District's designated management area and thus the District was the DMA with authority to provide wastewater treatment services to the subject area; (3) the order erroneously concluded that the ICC had no authority to deny Rockwell's request for a certificate of public convenience and necessity, because the IEPA issued permits to Rockwell; (4) the District was not estopped from asserting that it was the DMA and thus must serve the subject area; and (5) the ICC had a duty to consider and follow federal law; (B) the ICC's authority was preempted under principles of conflict preemption in that: (1) conflict preemption applied because Rockwell and the District cannot both provide wastewater treatment services to the subject area; (2) the ICC's order was arbitrary and capricious because it erroneously ignored the controlling federal law and provided that the ICC was not required to consider the controlling federal law in deciding whether to issue the certificate; (3) Rockwell's wastewater treatment system was not exempt from the CWA's requirements for

wastewater treatment; and (4) there was and is no emergency requiring or supporting the grant of a temporary certificate to Rockwell; (C) the ICC's finding that Rockwell was the least-cost option for providing water and wastewater treatment services to the subject area was not supported by substantial evidence in that: (1) the ICC's conclusion that Rockwell satisfied the requirements of section 8—406 of the Utilities Act (220 ILCS 5/8—406 (West 2006)) was erroneous because it was unsupported by the evidence presented; and (2) the ICC's conclusion that Rockwell was the only entity capable of providing services to the subject area was erroneous because it was unsupported by fact; (D) the ICC erroneously required the District to prove that it was the best option; and (E) the ICC improperly struck the District's brief on exceptions and almost all of its testimony and, therefore, the order was arbitrary and capricious in that it was based on an incomplete record. We will address each of the District's arguments in turn.

■ The Utilities Act establishes the standard of review of an ICC order. See 220 ILCS 5/10—201(e)(iv)(A) through (e)(iv)(D) (West 2006); see also *Quality Saw & Seal, Inc. v. Illinois Commerce Comm'n*, 374 Ill. App. 3d 776, 780-81 (2007). A reviewing court shall reverse a decision of the ICC, in whole or in part, where the court determines that: (1) the ICC's findings " 'are not supported by substantial evidence based on the entire record' " (*Quality Saw & Seal*, 374 Ill. App. 3d at 780, quoting 220 ILCS 5/10—201(e)(iv)(A) (West 2004)); (2) the ICC's order "is in violation of the State or federal constitution or laws" (220 ILCS 5/10—201(e)(iv)(C) (West 2006); see also *Quality Saw & Seal*, 374 Ill. App. 3d at 780-81); or (3) the ICC's findings are against the manifest weight of the evidence (*Quality Saw & Seal*, 374 Ill. App. 3d at 780-81). "The [ICC's] findings are *prima facie* evidence that an order was reasonable." *Ramsey Emergency Services, Inc. v. Illinois Commerce Comm'n*, 367 Ill. App. 3d 351, 357 (2006). To reverse an order on direct appeal from the ICC, an appellant must do more than merely show that the evidence presented would support a conclusion different from the one reached by the ICC; rather, the appellant must affirmatively demonstrate that the conclusion opposite to that reached by the ICC is clearly evident. See 220 ILCS 5/10—201(e)(iv) (West 2006); *Illinois Power Co. v. Illinois Commerce Comm'n*, 382 Ill. App. 3d 195, 201 (2008).

### A. The ICC'S Order Did Not Conflict With the Clean Water Act

#### (1), (2) The ICC's Order Did Not Violate the Clean Water Act Even If the District Was the DMA for the Subject Area

The District argues essentially that it had the exclusive right to provide wastewater treatment services to the subject area because it

was the DMA authorized through federal and state statutes and regulations to provide wastewater planning, collection, and treatment services. The District further contends that Rockwell failed to take this authority away from the District through the procedures required under the statutes and regulations.

The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent. *Krautsack v. Anderson*, 223 Ill. 2d 541, 552 (2006). The best indication of the legislature's intent is the statutory language given its plain and ordinary meaning. *People v. Jamison*, 229 Ill. 2d 184, 188 (2008). Where statutory provisions are clear and unambiguous, the plain language as written must be given effect, without reading into it exceptions, limitations, or conditions that the legislature did not express. *Taylor v. Pekin Insurance Co.*, 231 Ill. 2d 390, 395 (2008). Because this issue presents a question of law, we will review it *de novo*. "[T]he Commission's interpretation of a question of law is not binding on a court of review. [Citation.] The review of a question of law in an appellate court is *de novo*." *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 343 Ill. App. 3d 249, 254 (2003).

The CWA (33 U.S.C. §1251 *et seq.* (2006)) delegates its regulatory authority (through the United States Environmental Protection Agency) to state or regional regulatory schemes. 33 U.S.C. §1342 (2006). In Illinois, the CWA delegates its authority to regulate wastewater treatment and interconnecting sewer systems to the IEPA. 33 U.S.C. §1288 (2006); 415 ILCS 5/4(l) (West 2006); *Inland Steel Mortgage Acceptance Corp. v. Carlson*, 154 Ill. App. 3d 890, 893 (1987). The CWA requires the IEPA to promulgate WQM plans establishing the boundaries for wastewater treatment systems including treatment facilities and interconnecting sewer systems. 33 U.S.C. §1288 (2006); 415 ILCS 5/4(m) (West 2006). The Northeastern Illinois Planning Commission (NIPC)[1] serves as the area-wide planning agency for the subject area. See 70 ILCS 1705/33 (West 2006). The NIPC is responsible for establishing smaller regional areas with defined boundaries, referred to as "facility planning areas" (FPAs), that establish boundaries for regionalized sewage treatment. FPAs are included within WQM plans adopted by the IEPA. *Village of Frankfort v. Environmental Protection Agency*, 366 Ill. App. 3d 649, 651 (2006). The NIPC provides WQM plans according to criteria established by the IEPA and publishes a procedure manual for the amendment process. *Village of Frankfort*, 366 Ill. App. 3d at 651. The IEPA makes

---

[1]The NIPC is now also known as the Chicago Metropolitan Agency for Planning (CMAP).

final decisions regarding WQM and FPA amendments. *Village of Frankfort*, 366 Ill. App. 3d at 651.

An FPA is the area in which a DMA has the authority to plan, design, construct, own, and operate sewer facilities, including wastewater treatment facilities. *Town of Sugar Loaf v. Environmental Protection Agency*, 305 Ill. App. 3d 483, 485 (1999), *rev'd on other grounds, Kingbrook, Inc. v. Pupurs*, 202 Ill. 2d 24 (2002). A DMA is a "private or public entity that, under the provisions of the Clean Water Act, has the responsibility of planning, treating or transporting liquid domestic wastewater and its residual solids." 35 Ill. Adm. Code §399.20.

■ The District argues that Rockwell was required to follow certain procedures to become the DMA in the subject area. The District argues that, under the CWA, if an entity wants to provide wastewater treatment services within an FPA, it must become the DMA for the FPA. The District argues that Rockwell failed to comply with the following: (1) the IEPA procedures for the determination and payment of fees (35 Ill. Adm. Code §399.10); (2) federal procedures for "Designation and de-designation [of a DMA]" (40 C.F.R. §130.9(d) (2006)); (3) the IEPA dispute resolution procedures (35 Ill. Adm. Code §351.101); and (4) the "Illinois Water Quality Management Plan Amendment Package," published by the IEPA's Bureau of Water in 1992.

The first regulation cited by the District applies to: "[E]ach applicant who wishes to change the boundaries of a wastewater facility planning area through amendment to the Illinois Water Quality Management Plan *required* under the Federal [CWA]." (Emphasis. added.) 35 Ill. Adm. Code §399.40. However, nothing in the record indicates that Rockwell was trying to change the boundaries of a wastewater FPA; rather, the record shows that Rockwell was attempting to continue to run a utility that had been providing services in the subject area for 20 years. The FPA may mean the entire area over which the District claims control, and not the area that Lakemoor served for 20 years that may have preceded the District's existence. If Lakemoor's involvement preceded the District's existence, then this is an example of "grandfathering" (to exempt one involved in an activity or business from relatively new regulations).

The second regulation cited by the District provides:

"(d) Designated management agencies (DMA)—In accordance with section 208(c)(1) of the Act, management agencies shall be designated by the Governor in consultation with the designated planning agency. EPA shall approve such designations unless the DMA lacks the legal, financial and managerial authority required under section 208(c)(2) of the Act. *Designated management agen-*

*cies shall carry out responsibilities specified in Water Quality Management (WQM) plans.* Areawide planning agencies shall monitor DMA activities in their area and recommend necessary plan changes during the WQM plan update. Where there is no designated areawide planning agency, States shall monitor DMA activities and make any necessary changes during the WQM plan update." (Emphasis added.) 40 C.F.R. §130.9(d) (2006).

As made clear by the emphasized portion, a DMA is directed to carry out the responsibilities specified in the WQM plan. Nothing in the foregoing regulation grants a DMA a federal monopoly in providing services.

The third regulation cited by the District provides procedures and requirements for dispute resolution (35 Ill. Adm. Code §351.101). However, the District ignores that the procedures apply only to "point source discharges." See 35 Ill. Adm. Code §351.102. Rockwell's system is a spray irrigation system, not a point source system. Thus, the procedures provided in section 351.101 do not apply here.

Finally, the District cites the "Illinois Water Quality Management Plan Amendment Package" published by the IEPA's Bureau of Water in 1992. However, the District ignores that the IEPA had issued Lakemoor, Kirk, and Rockwell permits to operate and construct continuously since 1987, without complaint from the District. We defer to the IEPA regarding compliance with its own requirements. We also note that any complaints from the District regarding any alleged violations of these requirements are barred by estoppel. See *Lozman v. Putnam*, 379 Ill. App. 3d 807, 822 (2008).

The District also cites *Sugar Loaf*, 305 Ill. App. 3d 483, and *Inland Steel*, 154 Ill. App. 3d 890, to support its argument. The *Sugar Loaf* decision states that an FPA is "an area in which a [DMA], in this case Sugar Loaf, has the authority to plan, design, construct, own, and operate sewer facilities, including wastewater-treatment facilities." *Sugar Loaf*, 305 Ill. App. 3d at 484-85. However, the court in *Sugar Loaf* did not address whether an FPA is the *sole* entity that can plan, design, construct, own, and operate sewer facilities, including wastewater treatment facilities, within the area.

The *Inland Steel* court stated, "these [FPA] boundaries determine to which treatment facility the sewer system of a newly developed property must connect." *Inland Steel*, 154 Ill. App. 3d at 893. However, the *Inland Steel* court did not state that all sewer systems within the FPA must connect to the DMA of the FPA, as argued by the District. Additionally, although Rockwell may be new to the area, the system it has been authorized to operate is quite old and has operated independently of the District. Thus, these cases are not persuasive here.

### (3) The IEPA Issued Permits to Rockwell

■ The District argues that the ICC's order erroneously concluded that it had no authority to deny Rockwell's request for a certificate of public convenience and necessity, because the IEPA issued permits to Rockwell.

We note that in both *Sugar Loaf* and *Inland Steel*, the appellants sought review of decisions of the IEPA and of its director. *Sugar Loaf*, 305 Ill. App. 3d 483; *Inland Steel*, 154 Ill. App. 3d 890. In this case, the District seeks review of an ICC decision after the IEPA had already granted construction, capacity, and operational permits to Rockwell. The District did not seek review of the IEPA's granting of those permits, but sought review of the ICC's decision to grant Rockwell a certificate of public convenience and necessity. The District now argues that the ICC's order erroneously concluded that it had no authority to deny Rockwell's request for a certificate of public convenience and necessity, because the IEPA issued permits to Rockwell. However, the District cites no authority for its argument that the ICC is authorized to, in essence, review and overrule the IEPA's granting of permits.

The ICC is authorized to "see that the provisions of the Constitution and statutes of this State affecting public utilities, the enforcement of which is not specifically vested in some other officer or tribunal, are enforced and obeyed." 220 ILCS 5/4—201 (West 2006). The IEPA is authorized to administer the regulatory wastewater treatment scheme established by the CWA. 415 ILCS 5/4(l) (West 2006); see 33 U.S.C. §1288 (2006). The IEPA issues permits for the construction, installation, and operation of equipment capable of causing or contributing to water pollution or designed to prevent water pollution. 415 ILCS 5/12(b) (West 2006). Thus, it is the IEPA, and not the ICC, that enforces Illinois law relating to the CWA, and it is the IEPA that is vested with the requisite authority to grant Rockwell the appropriate permits. Further, review of IEPA decisions "shall be afforded directly in the Appellate Court for the District in which the cause of action arose." 415 ILCS 5/41(a) (West 2006). Accordingly, the ICC is not the proper forum in which to collaterally attack the IEPA's decisions to grant these permits.

### (4) The District Waited Over 20 Years to Contest the Permits

The District argues that it was not estopped from asserting that it was the DMA and thus must serve the subject area. However, because the District failed to object to the IEPA's grant of permits, and to siting and zoning approvals, the District's claim is barred by *laches*. To establish *laches* a party must establish that: (1) there was a lack of due diligence by the party attempting to make a claim, and (2) the

delay of the party attempting to make the claim resulted in prejudice to the other party. *Lozman*, 379 Ill. App. 3d at 822. Here, the record reveals that in the 20 years that Lakemoor and Rockwell received permits and siting and zoning approval, constructed and improved their facility, and acquired duties, responsibilities, and obligations, the District remained silent. Thus, the District is barred by *laches* from raising the claim that only the District must serve the subject area.

### (5) The ICC's Decision Does Not Violate Federal Law

■ The District also argues that the ICC had a duty to consider and follow federal law, namely the CWA and its regulations, and that the ICC's decision to uphold the IEPA's granting of permits to Rockwell conflicts with this federal law.

The Utilities Act authorizes the ICC to grant a certificate of public convenience and necessity upon an applicant's showing that it has met certain criteria set forth in section 8—406 of the Act. 220 ILCS 5/8—406 (West 2006). That section provides that after a hearing the ICC shall have the power to issue a certificate of public convenience and necessity once the applicant makes the required showing that proposed new construction will promote the public convenience and necessity. 220 ILCS 5/8—406(b) (West 2006).

Certainly, an ICC order that contravenes federal law is reversible. 220 ILCS 5/10—201(e)(iv) (West 2006). However, the District has not established that the ICC contravened federal law. The ICC had the authority, pursuant to section 8—406 of the Utilities Act, to grant Rockwell a certificate of convenience and necessity after it determined that Rockwell was in conformance with state-law requirements to serve as a public utility within the subject area. Rockwell's spray irrigation system does not impact the State's water quality. Rockwell's system is not the typical sewage treatment system where treated water is discharged into a surface water body. Rockwell's system is a land treatment system that does not impact ground or surface water quality. Rockwell's system is not a point source system, because there is no discharge to navigable water. Therefore, Rockwell did not need a national pollutant discharge elimination system (NPDES) permit to operate its system under the CWA. 33 U.S.C. §1342 (2006) (requiring permits for discharge into "navigable waters").

The District cites *United States v. City of Toledo*, 867 F. Supp. 603 (N.D. Ohio 1994), *United States v. Ohio Edison Co.*, 725 F. Supp. 928, 932-33 (N.D. Ohio 1989), *Citizens for a Better Environment-California v. Union Oil Co.*, 861 F. Supp. 889 (N.D. Cal. 1994), and *People ex rel. Madigan v. PSI Energy, Inc.*, 364 Ill. App. 3d 1041 (2006), to support its argument. However, these cases are not persuasive here.

In *City of Toledo*, 867 F. Supp. 603, a federal court determined that the Ohio Environmental Protection Agency could not excuse violations of an NPDES permit's effluent limits. However, contrary to the District's contention that the *City of Toledo* court based its holding on violation of federal law, the court actually based its decision on lack of authority under the Ohio environmental protection statute. *City of Toledo*, 867 F. Supp. at 607 ("Contrary to the City's contentions, the Court does not find authority for the proposition that a [Director's Final Findings and Orders] constitutes a basis for suspension of a Permit's conditions in Ohio Rev. Code §6111.03(H)(4)"). Thus, *City of Toledo* does not support the District's argument.

In *Union Oil Co.*, 861 F. Supp. 889, a state agency granted the defendants an extension to come into compliance with the CWA. The reviewing court held the extension invalid because it violated specific sections of the CWA (33 U.S.C. §§1314(l)(1)(C), (l)(1)(D) (2006)). *Union Oil Co.*, 861 F. Supp. at 895, 899. However, in this case, the District cites no specific federal law in direct conflict with the ICC's decision. Thus, *Union Oil Co.* is not applicable.

In *PSI Energy, Inc.*, 364 Ill. App. 3d 1041, an Indiana power plant was spewing pollution into Illinois. The court held that the CWA preempted state law because, in part, "state law may not be applied by one state to regulate an emissions source in another state." *PSI Energy, Inc.*, 364 Ill. App. 3d at 1044. In this case, the wastewater and sewage services in the subject area will not affect another state. Thus, *PSI Energy* is not applicable.

### B. There Is No Conflict Preemption

The District argues that the ICC incorrectly identified the preemption issue as one of either express or field preemption and that the problem actually was one of conflict preemption. The District argues that the ICC's decision was erroneous because it conflicts with federal law under principles of conflict preemption. The District contends that as the DMA the District had authority under the CWA to provide wastewater treatment for the subject area and that conflict preemption denied the ICC the authority to grant Rockwell a certificate of public convenience and necessity under Illinois law.

■ Under the supremacy clause, state law is preempted in three circumstances: (1) "express preemption," when Congress has clearly expressed an intention to do so; (2) "field preemption," when Congress has clearly intended, by legislating comprehensively, to occupy an entire field of regulation; and (3) "conflict preemption," when a state law conflicts with federal law. *Village of Frankfort v. Environmental Protection Agency*, 366 Ill. App. 3d 649, 659 (2006). In reviewing a

claim of preemption under the supremacy clause, courts must presume that Congress did not intend to displace state law. *Village of Frankfort*, 366 Ill. App. 3d at 659.

The District cites *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963), *Hines v. Davidowitz*, 312 U.S. 52, 85 L. Ed. 581, 61 S. Ct. 399 (1941), and *In re Marriage of Wiseman*, 316 Ill. App. 3d 631 (2000), to support its argument that conflict preemption arises in this case because the ICC's decision conflicts with federal law. These cases are distinguishable from the case at bar. Here, the ICC's action under state law does not conflict with any specific requirement of federal law. Therefore, the cases cited by the District do not apply here. Further, the facts in this case suggest a continuation of the service extant for over 20 years, rather than a present or future conflict.

(1) The ICC Had the Authority Under the Utilities Act to Grant Rockwell a Certificate of Public Convenience and Necessity

■ The District argues that conflict preemption applies to this case because under federal law Rockwell and the District could not both provide wastewater treatment service to the subject area. However, as previously stated, the ICC had the authority to grant Rockwell a certificate of public convenience and necessity under Illinois law, and the District has failed to cite to a specific provision of federal law that conflicts with this authority. Furthermore, the District's argument disregards the fact that the facility has been extant for over 20 years and has been deemed capable of properly functioning in the future. Thus, if only one of the parties may provide service, it was reasonable to conclude that it should be Rockford.

(2) The ICC Was Not Required to Review the IEPA's Granting of Permits to Rockwell

The District argues that the order was arbitrary and capricious because it erroneously ignored the controlling federal law and provided that the ICC was not required to consider the controlling federal law in deciding whether to issue the certificate.

On review, we may affirm on any basis supported by the record. See *Kimball Dawson, LLC v. City of Chicago Department of Zoning*, 369 Ill. App. 3d 780, 787 (2006). Further, the issue presented is one of law, which is reviewed *de novo. Illinois Bell Telephone Co.*, 343 Ill. App. 3d at 254.

In this case, we have determined that the ICC's decision did not conflict with federal law. The fact that the ICC did not expressly discuss this issue does not render its decision reversible.

The District cites *Bath Petroleum Storage, Inc. v. Sovas*, 309 F. Supp. 2d 357, 366, 371-72 (N.D.N.Y. 2004) (finding no federal conflict preemption), and *Valstad v. Cipriano*, 357 Ill. App. 3d 905, 924 (2005) (finding no federal conflict preemption). In these cases, the courts chose to discuss conflict preemption. However, that those courts chose to discuss conflict preemption does not invalidate the ICC's decision, even though the ICC did not discuss conflict preemption. The cases cited by the District do not state, or even imply, that it is error for a tribunal to omit discussion of an issue that would have been decided in the victor's favor.

The District's claim that the CWA conflicts with the ICC's implementation of state law is unavailing. The CWA provides that its standards are to be achieved through implementing state law (33 U.S.C. §1342 (2006)); in Illinois, the state law is the Illinois Environmental Protection Act (415 ILCS 5/1 *et seq.* (West 2006)). The record supports our determination that the ICC's decision in this case has achieved that goal. Therefore, there is no conflict between state and federal law.

### (3) Rockwell Was Not Required to Become the DMA for the District's FPA

The District argues that Rockwell's wastewater treatment system was not exempt from the CWA's requirements for wastewater treatment. Thus, the District argues that Rockwell was required to become the DMA for the FPA which includes the subject area, pursuant to section 1288(b)(2)(K) of the CWA. 33 U.S.C. §1288(b)(2)(K) (2006). The District argues that section 1288's broad language applies to all sources of pollution, including the lagoons that Rockwell's proposed system is to use. Section 1288 provides:

"Areawide waste water management

\* \* \*

(b) Planning process

\* \* \*

(2) Any plan prepared under this process shall include, but not be limited to[:]

\* \* \*

(K) a process to control the disposal of pollutants on land or in subsurface excavations within such area to protect ground and surface water quality." 33 U.S.C. §1288(b)(2)(K) (2006).

The District contends that this section plainly applies to Rockwell's system. However, the District ignores section 1288(e), which provides:

"(e) Permits not to conflict with approved plans

No permit under section 1342 ['Permits for Discharge of Pollutants'] of this title shall be issued for any *point source* which is in conflict with a plan approved pursuant to subsection (b) of this section." (Emphasis added.) 33 U.S.C. §1288(e) (2006).

Under the principle of *inclusio unius est exclusio alterius,* the enumeration of one thing in a statute is construed as the exclusion of all others. *Fisher v. Burstein,* 333 Ill. App. 3d 803, 807 (2002). Because section 1288 does not include any type of service other than "point source" service, we must conclude that other types are permissible under the section. Rockwell's system is not a point source system. Therefore, section 1288(b)(2)(K) does not require Rockwell to become the DMA for the FPA and does not conflict with the ICC's decision. Moreover, to the extent that the District is attempting to undermine the IEPA's grant of the permits, this argument is an improper collateral attack.

### (4) The ICC's Findings in Granting a Temporary Certificate Are Not Against the Manifest Weight of the Evidence

The District argues that there was and is no emergency requiring or supporting the grant of a temporary certificate to Rockwell on August 16, 2006. Specifically, the District notes that, in its motion to extend its temporary certificate, Rockwell stated that: "as of this date" (November 22, 2006), Rockwell had not assumed ownership or control of Lakemoor's plant and Lakemoor had not even agreed to a closing date. At a hearing on December 13, 2006, the District's counsel asked who had been operating Lakemoor's plant since the issuance of the temporary certificate, and Rockwell's counsel responded:

"Well, this is a status. I'm not prepared to give testimony. I can tell your Honor, based on my information—well, specifically from the date of the temporary certificate, I can't answer that question. It's my understanding that now an actual licensed, certified operator brought to the current owner by Rockwell, has stepped in and taken over or assisted the current owner in the operations of the facility."

The District asserts that these statements along with those contained in Rockwell's motion established that Lakemoor continued to operate the system even after the temporary certificate had been issued and that, therefore, there was no emergency and no basis on which to grant the temporary certificate.

Section 8—406(e) of the Utilities Act provides:

"The Commission may issue a temporary certificate which shall remain in force not to exceed one year in cases of emergency, to assure *maintenance of adequate service* or to serve particular custom-

ers, without notice or hearing, pending the determination of an application for a certificate, and may by regulation exempt from the requirements of this Section temporary acts or operations for which the issuance of a certificate will not be required in the public interest." (Emphasis added.) 220 ILCS 5/8—406(e) (West 2006).

In this case, Rockwell presented evidence that Lakemoor wanted to exit the utility business because its principal shareholder was physically unable to attend to the day-to-day operations, due to out-of-state confinement. Also, the IEPA had serious concerns about the manner in which Lakemoor operated its system. The Village was not immediately prepared to extend, or interested in extending, either water or sewer service to the subject area; no public utility was prepared to provide both water and sewer services to the subject area; and no nearby water or sanitary district was immediately prepared to provide both water and sewer services to the subject area. Therefore, even if Lakemoor was still providing services, the record shows that Lakemoor was hindered and that Rockwell was in a position to help Lakemoor and to take over as soon as possible, all in an effort "to assure maintenance of adequate service" (220 ILCS 5/8—406(e) (West 2006)). Thus, the ICC's decision to grant Rockwell a temporary certificate is not against the manifest weight of the evidence. Further, this issue is moot because the ICC subsequently granted Rockwell a permanent certificate.

## C. The ICC's Finding That Rockwell Was the Least-Cost Option Was Supported by Sufficient Evidence

### (1) The ICC's Finding That Rockwell Satisfied the Requirements of Section 8—406 of the Utilities Act Was Supported by Sufficient Evidence

■ The District argues that the ICC's conclusion that Rockwell satisfied the requirements of section 8—406(b) of the Utilities Act was erroneous and unsupported by the evidence presented. Section 8—406(b) provides in pertinent part:

"The Commission shall determine that proposed construction will promote the public convenience and necessity only if the utility demonstrates: (1) that the proposed construction is necessary to provide adequate, reliable, and efficient service to its customers and is the least-cost means of satisfying the service needs of its customers or that the proposed construction will promote the development of an effectively competitive electricity market that operates efficiently, is equitable to all customers, and is the least cost means of satisfying those objectives; (2) that the utility is capable of efficiently managing and supervising the construction

process and has taken sufficient action to ensure adequate and efficient construction and supervision thereof; and (3) that the utility is capable of financing the proposed construction without significant adverse financial consequences for the utility or its customers." 220 ILCS 5/8—406(b) (West Supp. 2007).

The District asserts that the evidence showed that Rockwell was a new utility that had never managed or supervised sewer and/or wastewater service to any other area before. The District asserts that Rockwell had no substantial assets and no utility personnel other than external consultants. The District also argues that all of the facilities and infrastructure Rockwell needed to serve the subject area would be newly constructed at substantial cost. The District argues further that Rockwell's financing was insufficient because it was based on a sole financial provider's (Kirk's) promise to loan Rockwell money when needed. This was especially important because Rockwell was an Illinois limited liability company (LLC) with a single member, Kirk. The District, citing section 10—10 of the Limited Liability Company Act (805 ILCS 180/10—10 (West 2006)), notes that members and managers of an LLC are not responsible for the debts and obligations of the LLC unless the members and managers so agree. Therefore, the District argues, Kirk could walk away from its obligations to Rockwell at any time, leaving Rockwell without funds and forcing residents in the subject area to pay Rockwell's outstanding debts and finance a new provider. This, according to the District, is not the least-cost means of satisfying the service needs of residents in the subject area.

The record supports the ICC's finding that Rockwell met the least-cost requirement under section 8—406(b)(1). ICC staff witness Smith testified that Rockwell met its burden because it was the only entity that currently had the facilities capable of providing water and sewer services to the subject area. Smith added that the District presented no information that he considered relevant to his analysis pursuant to section 8—406(b). On cross-examination, he testified that the District had no operating system within the subject area. Although he did not inspect any of the District's assets, he familiarized himself with the location of the District's collection mains as the information was given to him by Rockwell personnel.

In addition, the record does not show that the District was ready, willing or able to serve the subject area at any cost, much less at a lower cost than Rockwell. Smith testified that he had seen no convincing evidence that the District possessed the assets that were required to provide immediate sewer service to the subject area. The District's witness, Trotter, made only conclusory statements that the District had the economic wherewithal to own, operate, and maintain a potable

water supply and the necessary equipment. He criticized Rockwell's projected expenses but offered no analysis of the costs the District would incur to provide the same services. Thus, the District failed to present evidence as to how it would construct a water service plant or how it would do so on a least-cost means.

There is also no indication in the record that the District had any sewer facilities within the subject area. The District was constructing a sewer interceptor running north through the Village. However, the District offered no admissible evidence regarding how it would construct sewer facilities to serve throughout the subject area or how it would do so on a least-cost means. In contrast, Rockwell provided in-depth testimony regarding the purchase price of its system, its equity, debt, and financing capabilities, how costs would be minimized, and how the current facility's capacity could be increased at little or no additional cost to customers.

The record supports the ICC's finding that Rockwell is capable of efficiently managing and supervising the process, within the meaning of section 8—406(b)(2). Smith testified that Rockwell had the requisite technical and managerial capabilities to provide services to the subject area. Kirk's president and chief executive officer, Carroll, testified that he had hired MGD Water Systems, Inc., for the day-to-day operations of Rockwell's water and wastewater treatment operations. He outlined the extensive experience and certifications of MGD's principal. In addition, he testified that Rockwell engaged the services of an engineering firm with 30 years of water and wastewater treatment facilities planning and design experience. Also, although Rockwell was a new provider, the system had been in operation for many years and was well established. Regarding its management capabilities, Carroll detailed Rockwell's proposed management team, composed of financial, construction, real estate, and engineering personnel. The District's argument that Rockwell was a new utility ignores the evidence showing that Rockwell had retained experts that gave it the requisite capability to properly run a utility that had been in existence for over 20 years.

The record supports the ICC's finding that Rockwell was financially capable of serving the subject area, within the meaning of section 8—406(b)(3). Although Kirk was Rockwell's sole member, Carroll testified that in 2005 Kirk had revenues in excess of $134 million, assets of nearly $100 million, equity in excess of $40 million, and access to a $75 million line of credit of which $30 million was available to it on average. Kirk's low leverage-to-equity position allowed Kirk to make available significant capital to finance and operate Rockwell. Further, Rockwell supplied the ICC with a confidential independent

auditor's report, establishing its substantial assets. ICC staff member Freetly examined Rockwell's financial information and concluded that Rockwell possessed the requisite financial capability to operate, maintain, and construct additional facilities. In addition, Rockwell agreed to provide the ICC with periodic reports of Rockwell's actual financial information. The information the ICC staff would review on a prospective basis included Rockwell's plant investments, revenues, and expenses. Such information would aid the ICC in determining whether rates should be reassessed to ensure that Rockwell's temporary rates were not so low as to negatively impact its ability to serve the subject area.

The District argues that Rockwell's only source of capital comes from an unenforceable promise from Kirk to loan Rockwell money when needed. The District cites *Citizens Valley View Co. v. Illinois Commerce Comm'n*, 28 Ill. 2d 294, 303-04 (1963), and *Ramsey Emergency Services, Inc. v. Illinois Commerce Comm'n*, 367 Ill. App. 3d 351, 359 (2006), to support its position. However, these cases are factually distinguishable from the case at bar.

In *Citizens Valley View*, the appellate court reversed an ICC finding as to the utility's financial ability to provide service, because the only evidence that the utility offered was testimony that its major shareholder and his brother were "financially able to build these facilities and if necessary would furnish the money to" the utility. *Citizens Valley View*, 28 Ill. 2d at 304. The court noted that "[t]here was no disclosure as to the method the [major shareholder and his brother] proposed to utilize in supplying this money, whether it was to be by way of loan or otherwise. The entire sum of $1,210,000 needed to build the facilities is shown on the *pro forma* balance sheet as 'accounts payable' and *the company's proposed net worth is shown to be only $1,000.*" (Emphasis added.) *Citizens Valley View*, 28 Ill. 2d at 304. Further, the utility owned no facilities other than a well. *Citizens Valley View*, 28 Ill. 2d at 303-04.

In this case, Rockwell already owned its water and sewer facilities. Further, Rockwell possessed a substantial $1.825 million equity stake in the facilities and had obtained a letter of credit from Kirk for an additional $1.710 million. Moreover, Kirk did more than just promise to provide future funding. Rockwell had already acquired the assets of the system, and Kirk and Rockwell had already improved the facility. Further, Rockwell offered evidence of its own substantial net worth. Finally, Freetly testified that Rockwell possessed the requisite financial ability to operate, maintain, and construct additional facilities. Thus, Rockwell did not have to rely solely on Kirk for its financial support. Accordingly, *Citizens Valley View* is not controlling.

We must keep in mind that the record supports the ICC findings, which are *prima facie* true and correct. *Ramsey Emergency Services*, 367 Ill. App. 3d at 357-58. Given the evidence presented by both parties, we cannot say that the District has affirmatively demonstrated that it is clearly evident that Rockwell failed to satisfy the requirements of section 8—406(b). In other words, the District has failed to demonstrate that the opposite of the ICC's conclusions is clearly evident. See 220 ILCS 5/10—201(e)(iv) (West 2006); *Illinois Power Co.*, 382 Ill. App. 3d at 201.

(2) The District Does Not Support With Admitted Evidence Its Argument That the ICC Erred by Finding That Rockwell Was the Only Entity Capable of Providing Services to the Subject Area

The District claims that the ICC's conclusion that Rockwell was the only entity capable of providing services to the subject area was erroneous because it was unsupported by fact. The District makes its argument by stating that the District was ready, willing, and able to provide services to the subject area and by then describing its capabilities, without citing to the record. Our review of the record located this purported evidence in the stricken testimony of Kenneth Michaels. Therefore, the ICC did not consider this evidence. Further, even if it had considered this evidence and found it credible, it would not render the opposite conclusion clearly evident. There was no clear evidence that the District could provide the least-cost services to the subject area.

D. The District Is Not Protected by the First-in-the-Field Doctrine

The District argues that the ICC erroneously required the District to prove that it was the best option. Citing *Citizens Valley View*, the District asserts that "long standing legal precedent mandates that where there is an existing and operating utility in an area adjacent to property requiring service, the [ICC] cannot grant a newly organized and non-operating company a certificate of public convenience and necessity without proof or a specific finding that the District, as the existing and operating adjacent utility and DMA for the FPA is not ready, willing and able to provide the needed services." *Citizens Valley View*, 28 Ill. 2d at 299-03. Essentially, the District is arguing that the ICC failed to apply the first-in-the-field doctrine. See *Fountain Water District v. Illinois Commerce Comm'n*, 291 Ill. App. 3d 696, 700-01 (1997).

The District is not entitled to first-in-the-field doctrine status in this case. The first-in-the-field doctrine applies where additional or extended service is required and a utility already in the field makes known its willingness and ability to furnish the required service.

*Fountain Water District*, 291 Ill. App. 3d at 700-01. In such a case, the ICC may not grant a certificate of convenience and necessity to a competing utility not already in the field, unless the utility first in the field has had an opportunity to demonstrate its ability to give the required service. *Fountain Water District*, 291 Ill. App. 3d at 700-01. The first-in-the-field doctrine is meant to protect the pioneer in the field:

> "based on a consideration of the time and money expended by a [pioneering utility] in developing its business and rendering adequate service to the public and on the pioneer utility having taken the bitter with the sweet throughout the years of the development of the utility business in the area." *Fountain Water District*, 291 Ill. App. 3d at 701.

However, it is not enough that a utility is first in the field. It must also be "within the purview of the [ICC] and the [Utilities Act]." *Fountain Water District*, 291 Ill. App. 3d at 701.

In this case the record provides, and the District states in its brief, that it is a municipal corporation, not a public utility, and not within the purview of the Utilities Act and not under the control of the ICC. Accordingly, the first-in-the-field doctrine does not apply here. See *Fountain Water District*, 291 Ill. App. 3d at 701. We also doubt that the first-in-the-field doctrine applies to a situation where a certificate is issued to a provider that is taking over an up-and-running utility extant for more than 20 years.

### E. The ICC Did Not Abuse Its Discretion by Striking the District's Brief on Exceptions and Portions of Its Testimony

#### (1) The ICC's Decision to Strike the District's Brief on Exceptions Was Not Arbitrary or Capricious

■ The District argues that the ICC's striking of the District's brief on exceptions was erroneous and prejudicial to the District. Section 200.830 of the Administrative Code provides in pertinent part:

> "a) Within 14 days after service of the Hearing Examiner's proposed order, or such other time as is fixed by the Hearing Examiner, any party or Staff witness may file exceptions to the proposed order in a brief designated 'Brief on Exceptions' and within 7 days after the time for filing 'Briefs on Exceptions' or such other time as is set by the Hearing Examiner, any party or Staff witness may file as a reply, 'Brief in Reply to Exceptions.'
>
> b) Exceptions and replies thereto with respect to statements, findings of fact or rulings of law must be specific and must be stated and numbered separately in the brief. When exception is taken or reply thereto is made as to a statement or finding of fact,

*a suggested replacement statement or finding must be incorporated."* (Emphasis added.) 83 Ill. Adm. Code §§200.830(a), (b), amended at 20 Ill. Reg. 10607, eff. August 15, 1996.

We will not interfere with the discretionary authority vested in an administrative body unless that authority is exercised in an arbitrary or capricious manner or the administrative decision is against the manifest weight of the evidence. *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 369 Ill. App. 3d 128, 135 (2006). In this case, the ICC struck the District's brief on exceptions because it did not contain "a suggested replacement statement or finding," as expressly required by Title 83, section 200.830, of the Administrative Code, and as expressly directed by the ALJ. The ALJ also instructed all parties that "[b]riefs on exceptions not including such language shall be stricken." However, the District decided not to include the required language. Thus, the ICC's decision to strike the District's brief on exceptions was not arbitrary or capricious.

The District cites *County of Du Page v. Illinois Labor Relations Board, State Panel*, 375 Ill. App. 3d 765 (2007), to support its argument. In *County of Du Page*, the appellate court refused to strike the petitioner's brief, because its defect was merely formal. *County of Du Page*, 375 Ill. App. 3d at 770. In this case, the District's defect was substantive. A replacement statement would likely be helpful to the ICC in reconsidering its decision. Thus, *County of Du Page* is not controlling.

The District also cites *In re Application of County Treasurer & ex officio County Collector*, 373 Ill. App. 3d 679 (2007) (*Lake Carroll Ass'n*). The appellate court refused to strike a portion of the appellant's brief even though it exceeded the maximum page length. *Lake Carroll Ass'n*, 373 Ill. App. 3d at 683. However, like in *County of Du Page*, that defect was formal, not substantive. Further, that a court made a different determination based on a different set of facts does not render the ICC's decision in this case arbitrary or capricious. The District was directed by the ICC to include suggested replacement language or its brief would be stricken, yet it ignored the agency's directive. Thus, *Lake Carroll Ass'n* is not applicable here. The exercise of discretion in one instance does not exclude the converse or establish that the same exercise must apply here. Each case is to be decided as to whether, in its particular circumstances, no reasonable person would have done what the tribunal did. The *Lake Carroll Ass'n* court could have stricken the brief and that could have been a proper exercise of discretion as well.

(2) The ICC Decision to Strike Portions of the District's
Testimony Was Not Arbitrary or Capricious

The District argues that the ICC improperly struck almost all of the District's testimony and that, as a result, its order was based on an incomplete record and thus was arbitrary and capricious. First, the District argues that Michaels' testimony should not have been stricken. Michaels was the District's president. The District claims that Michaels "was the only witness who could present information to the [ICC] as to how the CWA requirements worked and how they were implemented at the District." Rockwell and the ICC staff argue that Michaels filed an appearance in this case and was thus the District's attorney and that his testimony offered legal conclusions.

The advocate-witness rule precludes an attorney from acting as an advocate and as a fact witness in the same case. See 134 Ill. 2d Rs. 3.3(a)(10), 3.7; *People v. Blue*, 189 Ill. 2d 99, 136 (2000); *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 912 (2007). However, the advocate-witness rule is not absolute. *Bauer*, 377 Ill. App. 3d at 913. An attorney may testify as a fact witness in a case in which he is also an advocate if, in the trial court's discretion, that testimony is *necessary*. *Bauer*, 377 Ill. App. 3d at 913. The decision to admit evidence is within the court's discretion and will not be disturbed on appeal absent an abuse of that discretion. *Bauer*, 377 Ill. App. 3d at 912. An abuse of discretion may be found where no reasonable person would take the view adopted by the court. *Bauer*, 377 Ill. App. 3d at 912.

In *Bauer*, defense counsel testified in brief rebuttal so that a court reporter's letter, a signed deposition signature page, and defense counsel's letter to the court reporter could be admitted into evidence, after opposing counsel claimed that the court reporter failed to report critical information in the deposition. *Bauer*, 377 Ill. App. 3d at 913. The appellate court explained that the admission of defense counsel's testimony was proper because he was the only one who could rebut opposing counsel's allegations regarding the deposition. *Bauer*, 377 Ill. App. 3d at 913. Therefore, his testimony was *necessary*. *Bauer*, 377 Ill. App. 3d at 913.

However, a witness may not give testimony regarding statutory interpretation, even if the witness is an attorney. *LID Associates v. Dolan*, 324 Ill. App. 3d 1047, 1058-59 (2001) (review of a jury trial). This rule applies to bench trials as well as jury trials. See *Magee v. Huppin-Fleck*, 279 Ill. App. 3d 81, 86 (1996) (the appellate court held while reviewing a bench trial that "[e]xpert testimony concerning statutory interpretation is not proper, even if the witness is an attorney"). Nor may a witness give testimony regarding legal conclusions. *LID Associates*, 324 Ill. App. 3d at 1058.

In this case, Michaels filed an appearance as the District's attorney. Therefore, his testimony was presumed barred unless the District could establish that it was necessary. See *Bauer*, 377 Ill. App. 3d at 913. Further, any testimony Michaels offered that constituted statutory interpretation or legal conclusions was properly barred. See *LID Associates*, 324 Ill. App. 3d at 1058-59; *Magee*, 279 Ill. App. 3d at 86.

The District's claim, that Michaels "was the only witness who could present information to the [ICC] as to how the CWA requirements worked," runs contrary to the prohibition against a witness providing testimony regarding statutory interpretation. See *Magee*, 279 Ill. App. 3d at 86. The CWA is a federal statute, and the ICC may not receive testimony regarding statutory interpretation from one of the attorneys of record.

Further, regarding Michaels' alleged factual testimony, the District asserts that Michaels was the only witness who could present information to the ICC as to how the CWA requirements "were implemented at the District." However, the District cites to nothing specific in the record to support its claim. The District also notes that Michaels "explained how the District is subject to CWA requirements and how it became the DMA for the FPA that includes the area Rockwell seeks to serve." The District further notes that Michaels' testimony "explained the District's wastewater treatment system and how it could quickly and fairly provide service to the subject area." The District states that Michaels also testified to the number of District employees and described the District's operations, facilities locations, and current construction. The District contends that Michaels described the "interaction of the various requirements to which the District and utilities are subject and how in practice these requirements work together and [are] implemented in a consistent way." While Michaels may have provided this factual testimony, the District has not informed this court how Michaels was the only person who could testify regarding these matters. Therefore, the District has not established that Michaels' factual testimony was *necessary*. Because Michaels appeared as an attorney in this case, testified to legal conclusions and statutory interpretation, and provided factual testimony not shown to be necessary, the ICC did not abuse its discretion by barring Michaels' testimony.

The District seems to argue that Michaels' appearance should not be recognized because Rockwell's counsel told Michaels that, before he could speak at status hearings in September 2006 and again in March 2007, Michaels had to enter an appearance because he was the only District representative available to discuss scheduling changes

requested by Rockwell. The District also notes that, later, Michaels agreed to withdraw his appearance. However, the record reveals that Michaels failed to withdraw his appearance. Because Michaels entered his appearance and failed to withdraw before he testified, we fail to understand how the statements of Rockwell's counsel are relevant to the above discussion.

Next, the District argues that the ICC erroneously struck the rebuttal testimony of George Roach, who testified regarding whether Rockwell could financially maintain the wastewater treatment service it proposed to provide. The District also argues that the ICC erroneously struck portions of Robert Scott Trotter's rebuttal testimony. Trotter, an engineer who responded to the testimony of Rockwell's engineer, Jeremy Lin, explained the engineering deficiencies in Rockwell's system. The District argues that it had no realistic opportunity to file a written response prior to the hearing on the motions to strike the testimony of Roach and Trotter. According to the District, Rockwell argued before the ICC that one cannot provide a rebuttal to direct testimony and that the Roach and Trotter testimony was filed out of order. The District contends that this was error because Rockwell filed surrebuttal testimony, having the last word on all issues, and did not explain how it was prejudiced by the District's rebuttal testimony or cite any law regarding the order of testimony.

Section 200.660 of Title 83 of the Illinois Administrative Code provides that a party who fails to present evidence in accordance with the schedule set by the ALJ "may be limited in the presentation of evidence in the proceeding or otherwise restricted in participation, to avoid undue delay and prejudice." 83 Ill. Adm. Code §200.660.

In this case, for the time period at issue, the ALJ set out the following schedule:

"[Rockwell] Revised Direct Testimony March 21, 2007
[ICC] Staff/[District] Direct Testimony April 20, 2007
[Rockwell] Rebuttal Testimony May 4, 2007
[ICC] Staff/[District] Rebuttal Testimony May 18, 2007
[Rockwell] Surrebuttal Testimony May 25, 2007
Evidentiary Hearing June 1, 2007."

This schedule clearly directed the District to respond to Rockwell's direct testimony with its own direct testimony and then respond to Rockwell's rebuttal testimony with its own rebuttal testimony. Trotter "admitted" that the purpose of his testimony was to rebut Lin's revised *direct* testimony. Because Trotter's rebuttal testimony did not rebut the rebuttal testimony of Rockwell or the ICC staff, the ALJ did not abuse his discretion by barring Trotter's testimony at issue.

On rebuttal, Roach discussed testimony and exhibits regarding rates, testifying that Rockwell had underestimated its operating expenses. Yet, this evidence was not admitted. Accordingly, the ALJ did not abuse his discretion by barring Roach's rebuttal testimony.

Roach's and Trotter's rebuttal testimony raised issues for the first time in the hearing. This prejudiced Rockwell by abbreviating its time to investigate and respond. Rockwell had only one week for its sur-rebuttal and during that time was burdened with an evidentiary hearing. Roach and Trotter should have raised these issues in their direct testimony.

The District argues that the ALJ erred by allowing it only two days to file its written response to Rockwell's and the ICC's motions to strike the witnesses' testimony. The motions to strike were filed two days before the hearing on the motions. However, the District fails to explain how this prejudiced it. For example, the District does not claim that at the hearing it was hindered by the short time period it had to file a written response to the motions. Further, the record does not support the District's argument. The record shows that the ALJ allowed the District from May 30 to June 5, 2007, to file its written response. Therefore, this argument does not sustain the claim of prejudicial error.

In conclusion, we believe that the claim that the ICC lacked authority to grant the certificate lacks merit. Furthermore, we believe that there was sufficient evidence to support the grant of the certificate. Also, we do not find an abuse of discretion in the ICC's admission of evidence. Finally, we believe that the record establishes that much of the District's argument is based upon the false belief that this case involves a new utility, instead of a utility that had been providing service for 20 years and had been operating with a certificate, despite the District's alleged exclusive authority in the subject area. If the ICC had determined that an estoppel had arisen as claimed by Rockwell regarding the operation of the utility for the past 20 years, such a finding would not have been against the manifest weight of the evidence.

The order of the Illinois Commerce Commission is affirmed.

Affirmed.

JORGENSEN and SCHOSTOK, JJ., concur.